**UNITED STATES of America, Appellee,**

v.

**Frank THOMPSON, Jr.,
Defendant-Appellant.**

**No. 531, Docket 82–1271.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 4, 1983.

Decided June 14, 1983.

Frank Askin, Newark, N.J. (Daniel H. Pollitt, Chapel Hill, N.C., Neal Rutledge, Washington, D.C., on brief); for defendant-appellant.

Lawrence H. Sharf, Sp. Counsel, Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., Edward A. McDonald, Atty.-in-Charge, Organized Crime Strike Force, Brooklyn, N.Y., on brief), for appellee.

Before TIMBERS, NEWMAN and PIERCE, Circuit Judges.

NEWMAN, Circuit Judge:

Former Congressman Frank Thompson, Jr. appeals from an order of the District Court for the Eastern District of New York

(George C. Pratt, Judge)[1] entered July 13, 1982, denying his motion for a new trial on bribery charges arising out of the Abscam investigation. Thompson's conviction was affirmed by this Court on September 3, 1982, *United States v. Myers,* 692 F.2d 823 (2d Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983). Thompson also appeals from Judge Pratt's subsequent order entered December 30, 1982, denying a motion to supplement the record on appeal.[2] For the reasons that follow we affirm the denial of both motions.

## I.

The details of the evidence on which Thompson was convicted are set out in our prior opinion, *id.* at 832–34, familiarity with which is assumed. In brief, the evidence disclosed that on October 9, 1979, undercover agents, posing as representatives of an Arab sheik, had transferred a briefcase containing $50,000 to Howard Criden in Thompson's presence, that Criden had given $20,000 of this money to Thompson, that Thompson had then arranged for a similar $50,000 transaction involving former Congressman John Murphy on October 20, 1979, and that Criden had given Thompson $10,000 of this money for himself and $15,000 for Murphy. At trial Thompson denied receiving any of the money transferred on October 9 and 20 and denied any knowledge of such money, claiming that he thought the briefcase transferred on October 9 contained only documents. Evidence of his receipt of money and his guilty knowledge included a videotaped conversation between Criden and the undercover agents on October 9, which revealed negotiations for the money to be transferred without Thompson's having to acknowledge it; testimony of Ellis Cook, Criden's law partner, recounting Criden's report that he had given Thompson $20,000 from the October 9 payment and $25,000 from the October 20 pay-

ment, of which $15,000 was for Murphy; the occurrence of the Murphy transaction, which Thompson had promised to arrange; and testimony of Congressman John Murtha that Thompson had solicited him to receive $50,000 of the sheik's money in return for assistance on immigration matters.

*The New Trial Claims.* In seeking a new trial, Thompson claims that newly discovered evidence will enable him to prove two circumstances allegedly pertinent to a jury's consideration of his guilt: first, that Melvin Weinberg, a key undercover operative in the Abscam operation, received as a kickback a significant portion of $100,000 of the sheik's money, which Weinberg had transferred to former Camden Mayor Angelo J. Errichetti on March 31, 1979, in the presence of the late Kenneth N. MacDonald, then vice-chairman of the New Jersey Casino Control Commission; and, second, that Weinberg received gifts of personal property from Errichetti. The alleged significance of these circumstances requires some elaboration.

Errichetti was a middleman in transactions resulting in the payment of bribes from the sheik's representatives to various public officials, including former Congressmen Michael O. Myers and Raymond F. Lederer. *See United States v. Myers, supra,* 692 F.2d at 829–32. The $100,000 payment to Errichetti in MacDonald's presence resulted in an indictment against MacDonald, who died before trial of the charges against him. Thompson contends that if Weinberg received a substantial portion of the $100,000 payment in the MacDonald transaction, a jury could infer that Weinberg had orchestrated a "scam within a scam." Thompson's theory is that Government agents were induced to part with $100,000 in the belief that its transfer to Errichetti would prove MacDonald's guilt of accepting a bribe from those he thought wanted a gambling license, either because

---

1. Judge Pratt, a member of this Court, was sitting by designation in the District Court.

2. We consolidated both appeals, heard oral argument on January 4, 1983, and allowed additional time thereafter for filing of briefs on the appeal from the denial of the motion to supplement the record.

MacDonald received a portion of the money or at least knew its transfer required him to compromise his office, whereas in reality MacDonald was the innocent victim of a plot whereby Errichetti took the $100,000 ostensibly for MacDonald's benefit, divided it with Weinberg, and left MacDonald with neither money nor knowledge of what was happening. Thompson tenders this theory in the hope of persuading a jury that if Weinberg used Errichetti to make the Government believe that MacDonald was guilty, he did the same thing with Criden to make the Government believe that Thompson was guilty, and that in both instances the target received no money and had no knowledge of a bribe.

The alleged significance of Weinberg's receipt of personal property from Errichetti is more straightforward. The claim is that Weinberg's credibility as a witness will be impeached since in testimony at Myers' trial he had denied receipt of any gifts from Errichetti.

*The New Trial Evidence.* To support his claims for a new trial, Thompson presented several items to the District Court. The principal item was a January 16, 1982, affidavit of Cynthia Marie Weinberg, the now deceased wife of Mel Weinberg. Marie Weinberg, as she was known, committed suicide ten days after signing the affidavit. In her affidavit she recounted an episode in which she drove her husband to a meeting with Errichetti at a Holiday Inn off the Long Island Expressway. Mel told her to park on the side of the road and said he had

to pick up something from Errichetti. He returned with a briefcase, which he patted, and said "forty-five." Mel told Marie that F.B.I. agent Anthony Amoroso, who was supposed to be watching Mel, did not know of this meeting because Mel had "ducked" him. Thompson contends Marie was referring to an episode first brought to the Government's attention on June 10, 1980, when an F.B.I. agent interviewed Joseph DiLorenzo, Errichetti's nephew and chauffeur. DiLorenzo recounted an episode in which he drove Errichetti to a meeting with Weinberg at a rest stop on the Long Island Expressway on April 1, 1979, the day after Weinberg had handed Errichetti, in MacDonald's presence, a briefcase containing $100,000. He said that Errichetti entered Weinberg's car, which he described as a Lincoln Continental, and gave Weinberg a briefcase. It is not clear whether Marie Weinberg and DiLorenzo are describing the same meeting (or whether either is reporting truthfully or whether Marie's affidavit is admissible [3]), but for purposes of this appeal we accept Thompson's claim that their statements are probative of Weinberg's receipt of $45,000 from Errichetti on April 1, 1979.[4]

Marie Weinberg's affidavit also reported that sometime in 1978 or 1979 her husband had brought home to their Long Island home several "gifts" from a "friend," including a microwave oven, a stereo system, a Betamax video recorder, and three Sony television sets. She also claimed that F.B.I.

3. Thompson suggests that Marie's affidavit would be admissible either as a declaration against interest, Fed.R.Evid. 804(b)(3), on the theory that she expressed concern for her safety in making the affidavit, or under the "catch-all" exception of the hearsay rule, Fed.R.Evid. 804(b)(5). We express no view on either evidentiary claim.

4. Thompson points out the unlikelihood that Weinberg and Errichetti had two meetings along the Long Island Expressway in early 1979 and the fact that DiLorenzo described the same make and model car that Marie said she was driving. Thompson relies especially on evidence, detailed in the text, *infra,* tending to show that Weinberg deliberately tried to create false evidence to show that Errichetti was in

Camden, New Jersey, at 2:30 p.m. on April 1, 1979. The Government points to various items indicating that Marie and DiLorenzo are talking about different meetings. Her affidavit places the meeting "between the end of 1978 and the beginning of 1978 [*sic*]"; even if she meant to say "the beginning of 1979," the Government contends that this time frame excludes April 1. In addition, she described an episode in which Weinberg left her car and returned with a briefcase, whereas DiLorenzo describes an episode in which Errichetti left his car and entered Weinberg's. Finally, in a lengthy recorded interview with a newspaperman, Indy Badhwar, Marie expressed her own doubts whether the meeting she recalled was the same one that DiLorenzo described.

agents had visited her home, observed these items, and helped pack them for shipment in connection with the Weinbergs' move to Florida. She further claimed that during one of the Abscam trials in 1980, her husband had telephoned her and told her to remove the microwave oven and video recorder from their Florida home and hide them elsewhere, which she did.

Also submitted in support of Thompson's new trial motion was a transcript of a recorded interview of Marie Weinberg conducted by Indy Badhwar, a newspaperman associated with columnist Jack Anderson, an affidavit from Badhwar concerning the interview, several photographs of personal property allegedly photographed in Mrs. Weinberg's apartment, and affidavits from Daniel A. Rezneck, Esq., trial counsel for Thompson, and from one of Rezneck's associates. Badhwar's affidavit and his transcript of his recorded interview with Marie add little, if anything, to the allegations of her affidavit. The photographs are obviously probative of the existence of the items Marie Weinberg claims were given to her husband. The affidavits of Rezneck and his associate purport to show the significance Thompson's trial counsel would have attached to evidence of Weinberg's receipt of a portion of the MacDonald payment. Rezneck asserts that prior to trial he considered a defense based on the claim that Weinberg and Criden were both plotting to obtain money in a scheme in which Thompson was an innocent dupe. His theory, outlined in a memorandum written prior to the trial, was that Criden thought he was scamming the sheik and Weinberg knew he was scamming the Government. Rezneck claims that he made no such allegations against Weinberg at Thompson's trial be-

cause of the outcome of the *Myers* trial, in which Weinberg denied allegations that he had received kickbacks and gifts and Myers was convicted.[5] Rezneck therefore defended Thompson on the theory that Criden alone had run a "scam within a scam." His conclusion is that knowledge of the materials offered in support of the new trial motion would have provided a "significantly stronger basis" for propounding his original defense theory.[6]

Thompson's December 16, 1982, motion to supplement the record on appeal from the denial of his new trial motion presented to the District Court an interim report by staff counsel to a Select Committee of the United States Senate investigating the Department of Justice's handling of the Abscam operation and written statements of Robert J. DelTufo and William W. Robertson, both former United States Attorneys for the District of New Jersey, and Justin P. Walder, counsel for MacDonald, submitted to the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary of the United States House of Representatives. On December 27, 1982, Thompson expanded his request by asking Judge Pratt to include in the record the portion of the Senate Select Committee's final report entitled "Allegations that Weinberg Shared in Bribe Payments to Abscam Suspects." *See Final Report of Select Committee to Study Undercover Activities of Components of the Department of Justice,* S.Rep. No. 97–682, 97th Cong., 2d Sess. 129–52 (1982) (hereafter "Select Committee Report"). In response to the motion to supplement the record, the Government submitted to Judge Pratt the portion of the Select Committee's final report entitled "Allegations Regarding Kenneth N. MacDo-

---

5. Why Myers' conviction should have deterred Thompson's trial counsel from claiming that Weinberg duped Thompson is not apparent. Myers, who was caught on videotape accepting cash and speaking explicitly about cash bribes, did not deny receiving money and did not claim to have been duped. His claim was that he was pretending to promise to use his office for the sheik's benefit, but never intended to do so. *See United States v. Myers, supra,* 692 F.2d at 831, 840–42.

6. Thompson's brief claims that Rezneck also asserts that he would have used his original theory (including Weinberg as a perpetrator of the "scam within a scam") if he had known of the subsequently disclosed allegations that Weinberg received part of the MacDonald payment. Br. for Appellant at 7. Rezneck's affidavit does not so state.

nald." *See* Select Committee Report, *supra,* at 241–62.

The principal items of evidence discussed in the documents submitted by Thompson concern the claim that Weinberg received a portion of the $100,000 he had paid to Errichetti in MacDonald's presence. Most of this evidence had previously been presented to Judge Pratt in the course of the due process hearing that he conducted after the conclusion of the trials of Thompson, Murphy, Myers, and Lederer. The excerpt from the Select Committee's report summarizes Errichetti's testimony to the Committee that he had met Weinberg at a rest stop along the Long Island Expressway on April 1, 1979, and given him $37,500 of the $100,000 MacDonald payment. Select Committee Report, *supra,* at 142–43. He also told the Committee that this $37,500, plus $25,000 of bribe money he claimed to have given back to Weinberg on January 20, 1979, was to have been placed in an escrow account for use when Errichetti and MacDonald retired. *Id.* at 143.

The Committee's report also sets forth evidence indicating that Weinberg misled the Abscam investigators and prosecutors into disbelieving DiLorenzo's June 10, 1980, report that Errichetti and Weinberg had met on April 1, 1979. Weinberg had given the agents a tape recording of an eight-minute telephone call he made on April 1 from Long Island to Errichetti in Camden, New Jersey. The recorded conversation is preceded by a preamble in which Weinberg noted the time to be 2:30 p.m. He then labeled the cassette to reflect a 2:30 p.m. conversation. However, toll call records for April 1, 1979, reflect a call of eight minutes' duration from Weinberg to Errichetti in Camden, not at 2:30 p.m., but at 4:54 p.m.

Moreover, the tape of this conversation is the only one, out of hundreds of telephone conversations recorded by Weinberg, that is preceded by a preamble noting the date and time.[7] *Id.* at 143–47. This evidence is probative of the conclusion, advanced by Thompson and shared by the Select Committee, *id.* at 146, that Weinberg faked the time of the 4:54 p.m. phone call to create evidence that would lead the Government to believe that Errichetti was in Camden at 2:30 p.m. and had not met with Weinberg along the Long Island Expressway on that date.[8] The Committee relied on this evidence of a false alibi as the primary reason for crediting Errichetti's claim that he had met Weinberg on April 1 and given him a portion of the MacDonald payment. *Id.* at 143.

*The District Court's Rulings.* Judge Pratt denied the motion for a new trial, ruling that the evidence offered to prove that Weinberg had shared in the MacDonald payment was not material to Thompson's case and would not likely have led to an acquittal. *See United States v. Gilbert,* 668 F.2d 94, 96 (2d Cir.1981), *cert. denied,* 456 U.S. 946, 102 S.Ct. 2014, 72 L.Ed.2d 469 (1982). He reasoned that since Thompson's defense had been that he was being "scammed" by someone and had no knowledge of any payments of money to himself or others, evidence suggesting that Weinberg participated in a "scam within a scam" would have added little if anything to the defense. Judge Pratt did not explicitly mention the claim that evidence concerning Weinberg's receipt of personal property would have impeached his credibility; however, by referring to prior rulings on new trial motions by other Abscam defendants, including Myers, Errichetti, and Criden,

---

7. In this recorded conversation, Errichetti tells Weinberg that the $100,000 was given to MacDonald, that MacDonald authorized a payment of $25,000 to Amoroso to cover the cost of repairing the sheik's yacht, and that MacDonald was happy with the remaining $75,000. Select Committee Report, *supra,* at 145.

8. DiLorenzo's account of the April 1, 1979, meeting had not specified a precise time of day. Apparently the Select Committee came to the

conclusion that Weinberg's effort to make the 4:54 p.m. phone call appear to have been made at 2:30 p.m. shows that the meeting occurred at 2:30 p.m., a time for which Weinberg realized he might need an alibi. Weinberg told the Committee he recorded the preamble at 2:30 p.m., experienced a delay in reaching Errichetti, and then forgot that the preamble did not accurately reflect the time the call was actually made. Select Committee Report, *supra,* at 144.

Judge Pratt obviously intended to reiterate his prior conclusion that the claim failed both because Weinberg's testimony was not significant and because abundant evidence had been available to impeach Weinberg's credibility.

In denying Thompson's motion to supplement the record, Judge Pratt rested his decision on the ground that the evidence described in the materials submitted, elaborating upon the MacDonald payment, would have been excluded from evidence under Fed.R.Evid. 403 if offered at Thompson's trial. He stated that the probative value of the evidence that MacDonald had been duped was "small" with respect to Thompson's guilt or innocence and that the "low probative value" was substantially outweighed by "the dangers of confusion of issues and waste of time" since it would have been necessary to try the entire Mac-Donald case in order to present to a jury the claim that Thompson sought to base on the MacDonald transaction. He also observed that the evidence that MacDonald had been duped was "not strong." In this connection he noted the marked difference between the preliminary views of the Select Committee counsel in their interim report and the views of the Committee in its final report. The final report states that an "incomplete review" of Abscam files had caused the Committee's counsel to suggest in their interim report that there was substantial evidence that Errichetti had duped MacDonald, Select Committee Report, *supra,* at 241; the final report concludes that "the weight of the evidence shows that MacDonald knowingly attended the March 31, 1979, meeting with the intent of using the influence of his public office for the purpose of enabling his companion, Angelo Errichetti, to obtain a payment of $100,000 and for the further purpose of obtaining either an immediate or a future benefit for himself." *Id.* at 242.

*Claims on Appeal.* On appeal Thompson challenges Judge Pratt's conclusions and also contends that he applied too strict a standard in assessing the new trial motion. In Thompson's view, his motion should not have been tested under the standard of

Fed.R.Crim.P. 33—whether the evidence would likely have led to an acquittal, *United States v. Gilbert, supra,* but under the more exacting standards, outlined in *United States v. Agurs,* 427 U.S. 97, 103–07, 96 S.Ct. 2392, 2397–99, 49 L.Ed.2d 342 (1976), that apply when the Government fails to disclose evidence that would show perjury by a prosecution witness of which the prosecution was or should have been aware, *see Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935) (per curiam), or fails to disclose material exculpatory evidence in response to a specific request, *see Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963). In these circumstances, a new trial is warranted if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury," *Agurs, supra,* 427 U.S. at 103, 96 S.Ct. at 2397 (footnote omitted), or if the undisclosed exculpatory evidence "might have affected the outcome of the trial," *id.* at 104, 96 S.Ct. at 2397. Thompson contends that the Government knew or should have known that Weinberg's denial of receiving gifts or kickbacks was false and that its entire theory of Thompson's guilt was false; he also urges that DiLorenzo's June 10, 1980, claim that Weinberg received a portion of the $100,000 MacDonald payment should have been disclosed pursuant to a pretrial *Brady* request.

## II.

■ *Allegations of Gifts to Weinberg.* There is no basis whatever for a new trial based on Marie Weinberg's averment that her husband received gifts of personal property from a "friend" (presumably Errichetti). Even if such gifts were received, this would have had no bearing on the issues in Thompson's trial. Weinberg was never asked about such gifts at Thompson's trial and consequently never denied receiving them. Moreover, there was abundant evidence available to Thompson to impeach Weinberg, if he had cared to do so. Finally, Weinberg's testimony against Thompson was "not significant," as Thompson himself

concedes.[9] Reply Br. for Appellant at 8. Thus, under Rule 33 or any of the standards discussed in *Agurs,* evidence of Weinberg's receipt of a microwave oven and other items from Errichetti does not remotely warrant a new trial.[10]

■ *Allegations of Kickbacks to Weinberg.* As Thompson points out on appeal, his argument really does not concern the credibility of Weinberg; instead, he advances the more fundamental claim that his alleged new evidence of Weinberg's receipt of kickbacks and the undisclosed report of DiLorenzo's account of the April 1, 1979, meeting at which Weinberg allegedly received a portion of the $100,000 MacDonald payment combine to provide a basis on which Thompson could have established a successful defense to the charges against him. If he could have shown that Weinberg and Errichetti duped MacDonald, then, he contends, the jury in this case would have been more likely to believe that Weinberg and Criden duped Thompson.

We agree with Judge Pratt that the evidence in support of this claim does not warrant a new trial for the fundamental reason that it would not be admissible. Judge Pratt, having presided at Thompson's trial, was in the best position to make the assessment required by Rule 403. As he concluded, the probative force of the new evidence is not substantial. It may show, as the Senate Select Committee concluded, that Weinberg received a portion of the $100,000 MacDonald payment. But it does not show that MacDonald did not receive some of that money, and it leaves entirely

to conjecture the claim that MacDonald was duped, a conclusion the Select Committee firmly rejected. Select Committee Report, *supra,* at 242. It is entirely too speculative to move from the claim that Weinberg received a kickback (itself a matter of sharp dispute), to the claim that Weinberg and Errichetti duped MacDonald, and then to the ultimate claim that Weinberg and Criden (without Errichetti) duped Thompson. Moreover, the complicated and often contradictory evidence concerning the MacDonald payment, which we have only barely indicated, abundantly supports Judge Pratt's conclusion that Thompson's current claim would have required trial of the entire MacDonald case.[11] Judge Pratt did not err in ruling that the probative weight of the evidence concerning the MacDonald payment and its disposition was substantially outweighed by the dangers of confusion and delay.

Furthermore, we agree with the Government that the prosecution's knowledge, prior to trial, of DiLorenzo's account of the April 1, 1979, meeting between Errichetti and Weinberg does not trigger scrutiny of Thompson's new trial claim under either of the strict standards of *Agurs* that apply to knowing use of perjured testimony or failure to produce specifically requested exculpatory evidence. Since Weinberg was never asked at Thompson's trial about meeting Errichetti on April 1 or ever receiving a kickback from him, there was no denial of these alleged occurrences that can even be claimed to have been false, much less known to the prosecution to have been false.[12] Nor can it fairly be said, as Thomp-

---

**9.** Weinberg's direct testimony at Thompson's trial was devoted, almost entirely, to qualifying for admission audio- and videotapes of conversations in which he had participated.

**10.** In view of the complete lack of significance of the "gift" evidence to Thompson's trial, we have no occasion to assess whether Marie Weinberg's affidavit provides facts or only conclusory suppositions concerning the alleged knowledge by F.B.I. agents of her husband's receipt of gifts from Errichetti.

**11.** Since exclusion of the MacDonald evidence would have been a correct application of Rule

403, we need not consider the substantial threshold objection that such evidence would have been excludable under Rule 404(b) as evidence of other acts offered to show that on another occasion a person (Weinberg) acted in conformity with a character trait.

**12.** At Thompson's trial, defense counsel elicited from Weinberg on cross-examination his denial of receiving any portion of the Thompson or Murphy payments from Criden. This appears to have been done not to impeach Weinberg, but to use Weinberg's testimony in an effort to discredit Criden's report to Ellis Cook, his law partner, concerning payments to Thompson.

son contends, that with awareness of DiLorenzo's account of the April 1 meeting, the prosecution knew or should have known that Thompson was duped, thereby rendering the entire Government case against him false. When DiLorenzo gave his account of the April 1 meeting, the Government had Weinberg's denial that such a meeting had taken place and also had his tape of his telephone conversation with Errichetti that appeared to preclude a 2:30 p.m. meeting on Long Island. It remains a matter of dispute whether Weinberg met with Errichetti on April 1 and ever received a kickback from him. It is fanciful to suggest that the Government knew or should have known that such a meeting occurred, that "therefore" a kickback was received, that "therefore" MacDonald was duped, and that "therefore" Thompson was duped. Neither prior to Thompson's trial, nor since, is there any basis to believe that any of the evidence against him was known to the prosecution to be false, or was false at all.[13]

Nor was DiLorenzo's account of the April 1 meeting producible as *Brady* material. Thompson's detailed pretrial *Brady* motion made a series of requests for Government benefits conferred on Weinberg in the form of salary, expenses, and consideration on criminal charges, and then sought in item 24(e) "any payments, compensation, gifts, fees, or any other things of value given to or for the benefit of Melvin Weinberg." It was entirely appropriate for the prosecution to understand this request as focusing on benefits from the Government. Thus viewed, DiLorenzo's account of the April 1 meeting, with its arguable inference that Weinberg received a kickback from Errichetti, was not specifically requested *Brady* material within the meaning of *Agurs.*

We therefore conclude that Judge Pratt was entirely correct in denying the motion for new trial and in denying the subsequent motion to supplement the record on appeal. However, as Thompson points out, the materials sought to be added to the record could have been submitted in support of a second motion for a new trial; since Judge Pratt assessed their legal significance and found them insufficient to warrant a new trial and since we agree with that conclusion, we will exercise our discretion under Rule 10(e) of the Federal Rules of Appellate Procedure to supplement the record with all of the materials Thompson submitted to Judge Pratt plus the MacDonald section of the Select Committee's Final Report, submitted to Judge Pratt by the Government. Upon the entire record, the denial of a new trial is affirmed.

---

Cook testified that Criden told him he had paid portions of each of the two $50,000 payments to Thompson and also had paid small amounts to Weinberg and Amoroso.

**13.** Ironically, the one item of evidence from all of the materials tendered by Thompson that relates most directly to Thompson's guilt or innocence points markedly toward guilt. The Select Committee's final report recounts Criden's testimony to the Committee that he did transfer portions of the two $50,000 payments to Thompson. Select Committee Report, *supra*, at 151 n. 105.