UNITED STATES of America, Appellee,

v.

Christopher J. IRVING, Appellant.

No. 86–1342.

United States Court of Appeals, Eighth Circuit.

Submitted Aug. 3, 1987.

Decided Aug. 31, 1987.

Robert G. Duncan, Kansas City, Mo., for appellant.

J. Whitfield Moody, Asst. U.S. Atty., Kansas City, Mo., for appellee.

Before McMILLIAN, FAGG and BOWMAN, Circuit Judges.

PER CURIAM.

Christopher J. Irving appeals from a final judgment entered in the District Court[1] for the Western District of Missouri upon a jury verdict finding him guilty of conspiracy to counterfeit and possession of a similitude of a $20 reserve note, in violation of 18 U.S.C. §§ 471, 474. For reversal, Irving argues that the district court erred in failing to grant his motion for judgment of acquittal notwithstanding the verdict because (1) he was entrapped as a matter of law; and (2) the government was barred from prosecuting him because its investigation of his activities was so outrageous as to deprive him of due process of law. For the reasons discussed below, we affirm the judgment of the district court.

## I. FACTS

The facts are not in dispute. In July 1985, while working as a part-time clerk at the Commerce Bank, Irving contacted a former grade school friend, John B. Kendall, and asked Kendall to help him produce counterfeit funds. Kendall, however, was already aware of Irving's intentions. Earlier, at Irving's request, a mutual friend contacted Kendall, indicating that Irving would be seeking his assistance in the counterfeiting scheme. By the time Irving called, Kendall had already informed the Independence Police Department of Irving's plans. That information was passed along to Secret Service Agent James P. O'Connor. O'Connor instructed Kendall to "play along" with Irving's plans, but not to volunteer any suggestions.

Shortly after he alerted the police to Irving's plan, Kendall met with Irving. Irving told Kendall that he had some "genuine perfect $20 bills ... [t]hat he had actually photostatic [sic] copied." Irving told Kendall that he was interested in producing $200,000 in counterfeit money,[2] and asked Kendall if Kendall would assist him in printing and distributing the counterfeit $20 bills.

Over the course of the next several weeks, Irving and Kendall continued discussing various elements of the operation. At various times, Irving's co-conspirators were also present.[3] Irving told Kendall that he had found someone to produce the negatives to be used in the counterfeiting, and that 26 negatives had actually been produced. He instructed Kendall to produce the bills in seven different serial numbers. In response to Irving's requests, undercover agents assisted Irving in purchasing paper and other "printing paraphernalia" necessary to produce the counterfeit money. The Secret Service located a vacant office and carried out the actual printing of the money. On September 15, 1985, when Irving arrived at the office to pick up the counterfeit money, Secret Service agents arrested him and charged him with conspiracy to counterfeit and possession of a similitude of a $20 reserve note.

Prior to his trial, Irving filed a motion to dismiss the indictment claiming that the government's conduct was so outrageous as to deprive him of due process of law and thus barred prosecution of his case. On November 13, 1985, an evidentiary hearing

---

1. The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri.

2. Apparently, at some point in the operation, this figure increased to $4 million. (Doc. No. 74, T. 22).

3. The three co-conspirators charged in the original indictment were: David A. Cordes, Daniel K. Firsick, and Keith F. Rugh. Two of Irving's co-defendants were acquitted in a separate trial and charges against the third were dismissed.

was held before the Honorable Calvin K. Hamilton, Chief United States Magistrate for the Western District of Missouri, Western Division. Magistrate Hamilton found that: (1) "the record [was] replete with evidence of [Irving's] predisposition to counterfeit [and his] subsequent acts demonstrated that [his] intent to counterfeit merely continued after the government's involvement increased"; and (2) "[d]espite the government's extensive involvement, it was, viewed as a whole, primarily a supporting role performed at the behest of the defendants, rather than an endeavor to instigate, importune, or induce the commission of a criminal act." Report and Recommendation, December 18, 1985, at 21–22. Based on these findings, the magistrate recommended denial of Irving's motion to dismiss. The district court adopted that recommendation in its order dated January 9, 1986, and Irving's case proceeded to trial.

At the close of the trial, the court refused to submit Irving's proffered instructions on entrapment to the jury, in light of Irving's admission that he was predisposed to commit the unlawful act of counterfeiting. The court also ruled that the question of the government's outrageous conduct was one for the court rather than the jury. The jury ultimately returned a verdict of guilty on both counts and Irving was sentenced to eighteen months imprisonment on each count, to run concurrently and to be followed by three years probation.[4] His motion for judgment of acquittal notwithstanding the verdict or for a new trial was denied and this appeal followed.

On appeal, Irving reasserts the arguments raised in the district court, that (1) the government's conduct amounted to entrapment as a matter of law; and, (2) the government was barred from prosecuting him because its conduct was so outrageous as to deprive him of his due process rights.

## II. DISCUSSION

### A. Entrapment

■ The fundamental rationale of the entrapment defense is that a defendant charged with a criminal offense is not guilty if the criminal intent was implanted in him by the government. *United States v. Lard,* 734 F.2d 1290, 1292–93 (8th Cir. 1984) (*Lard*). The principal focus of inquiry is the defendant's predisposition to commit the crime alleged, *United States v. King,* 803 F.2d 387, 390 (8th Cir.1986), which the government must prove beyond a reasonable doubt. *Lard,* 734 F.2d at 1294 n. 3. In order for a defendant to demonstrate entrapment as a matter of law,

> the evidence must clearly have indicated that a government agent originated the criminal design; that the agent implanted in the mind of an innocent person the disposition to commit the offense; and that the defendant then committed the criminal act at the urging of the government agent.

*United States v. Shaw,* 570 F.2d 770, 772 (8th Cir.1978). In no event, though, can the defense of entrapment "ever be based upon governmental misconduct in a case ... where the predisposition of the defendant to commit the crime was established." *Hampton v. United States,* 425 U.S. 484, 488–89, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976) (*Hampton*).

The Supreme Court's decision in *Hampton* forecloses Irving's claims that he was entrapped by the government as a matter of law. The record is replete with examples of Irving's predisposition to produce counterfeit funds. It was Irving who first arranged a meeting with the printer, Kendall. It was Irving who supplied the new $20 bills and who located an individual whom he believed was capable of producing the negatives necessary to complete the process. And it was Irving who determined the amount to be printed and who instructed the printers to produce the bills in seven separate serial numbers. In short, from start to finish, Irving exhibited a clear disposition to commit the crime with which he was charged. Accordingly, we

---

4. After serving three months, the remainder of Irving's incarceration time was suspended. At present, Irving is serving the probationary portion of his sentence.

reject his argument that he demonstrated entrapment as a matter of law.

### B. Outrageous Conduct

Irving's second argument is that the degree of government participation in the crime was so fundamentally unfair as to require dismissal of the indictment. The Supreme Court, in *United States v. Russell*, 411 U.S. 423, 431, 93 S.Ct. 1637, 1642, 36 L.Ed.2d 366 (1973) (*Russell*), recognized that "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction...." In *Hampton*, a plurality of justices reaffirmed the Court's earlier statement in *Russell*. 425 U.S. at 495–97, 96 S.Ct. at 1652–54 (Powell J., concurring); (Brennan, J., dissenting). Thus, "apart from any question of predisposition of a defendant to commit the offense in question, governmental participation may be so outrageous or fundamentally unfair as to deprive the defendant of due process of law...." *United States v. Quinn*, 543 F.2d 640, 648 (8th Cir.1976). Resolution of that issue is, however, solely a question of law for the court. *Id.* Moreover, if a person is predisposed to commit an offense, "it may safely be said that investigative officers and agents may go a long way in concert with the [defendant] without being deemed to have acted so outrageously as to violate due process...." *Id.*

We have carefully reviewed the record and conclude that the special agents' involvement, although substantial, was not so outrageous or fundamentally unfair as to bar Irving's prosecution and conviction. Like the situation in *United States v. Reifsteck*, 535 F.2d 1030 (8th Cir.1976) (*Reifsteck*), the illegal activity in the present case did not originate with the special agents; Irving approached Kendall for help in arranging the counterfeit operation. Moreover, the fact that, according to Irving, the negatives he provided the undercover agents proved worthless, does nothing to rebut the finding that he was an active participant in the illegal activity. Fi-

nally, as was the case in *Reifsteck*, the government's actions here in locating the press and printing the counterfeit funds were done at Irving's behest and were primarily for his benefit. The government's conduct, then, did not violate principles of fundamental fairness.

Accordingly, we affirm the judgment of the district court.