**UNITED STATES of America, Appellee,**

v.

**Keith M. JACOBSON, Appellant.**

**No. 88-2097.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 14, 1989.

Decided Jan. 12, 1990.

HEANEY, Senior Circuit Judge.

 Keith Jacobson was convicted of one count of receiving child pornography through the mails. On appeal, Jacobson argues that he was entrapped as a matter of law because the government failed to show that he was predisposed to commit the crime and that the government's outrageous conduct gave rise to a violation of due process. We overturn the conviction because, before instituting an undercover operation at Jacobson, the government had no evidence giving rise to a reasonable suspicion that Jacobson had committed a similar crime in the past or was likely to commit such a crime in the future.

### I. BACKGROUND

Keith Jacobson is a fifty-seven year old resident of Newman Grove, Nebraska, currently living on a family farm and supporting his parents. Jacobson served in the Korean and Vietnam Wars, for which he received the Bronze Star and the Army Commendation Medal. He has no criminal

history, with the exception of a conviction for driving while intoxicated in 1958.

On February 4, 1984, Jacobson ordered two magazines and a brochure from Dennis Odom, who does business as the Electric Moon in San Diego, California. On May 11, 1984, the government executed a search warrant on the Electric Moon business premises and seized the business' mailing list. Jacobson's name and address were on that mailing list.

The two magazines Jacobson ordered were "Bare Boys I" and "Bare Boys II." They were nudist magazines, the receipt of which did not violate any law. Receipts for his order were found in Blue Moon's files. Jacobson also ordered a brochure in which he failed to order any materials or contact any of the sources listed. The government had no other information at the time that Jacobson was purchasing through the mails or producing child pornography, or that he was predisposed to do either.

Nevertheless, the government made Jacobson the target of five undercover sting operations over a period of two and one-half years. Various postal inspectors surreptitiously contacted Jacobson more than eleven times. Jacobson answered a survey sent to him during the first undercover operation. In his response, he indicated a predisposition to receive through the mails sexually explicit materials depicting children. After several opportunities to purchase such materials under government observation, Jacobson ordered "Boys Who Love Boys," a magazine containing sexually explicit materials depicting minors. After sending him this publication, government agents arrested Jacobson and searched his home. No other illegal materials were found.

The government indicted Jacobson on September 14, 1987, on one count of receiving through the mails a visual depiction, the production of which involved the use of a minor engaging in sexually explicit conduct. Jacobson was tried in front of a jury consisting of nine women and three men on April 22, 1988. On April 26, 1988, the jury returned a verdict of guilty. The judge sentenced Jacobson to two years probation and 250 hours of community service.

## II. DISCUSSION

Jacobson raises several arguments on appeal, but at the heart of each argument is the assertion that the government lacked a basis for making Jacobson a target of an undercover operation. In response, the government argues that, while his purchase of the two magazines from Electric Moon constituted legal conduct, the purchases evidenced a predisposition to purchase illegal child pornography. Our view is threefold: (1) the Electric Moon purchase was not evidence of predisposition and did not give rise to a reasonable suspicion based on articulable facts that Jacobson had committed a crime in the past or was likely to commit a crime in the future; (2) the government must have reasonable suspicion based on articulable facts before instituting an undercover operation directed at a person; and (3) since the undercover operation was improper, Jacobson's conviction must be set aside because there was no evidence of an intervening act which cured the government's improper conduct.

The government asserts in its brief that the Electric Moon purchase was sufficient evidence of predisposition to justify the institution of an undercover operation against Jacobson. We disagree. In our view, at the time it commenced its undercover operation, the government had no evidence giving rise to a reasonable suspicion that Jacobson had committed a crime or was about to commit one. This is simply a case where a legal act took place and the government directed an extensive undercover operation at the person who committed the legal act. When an individual engages in legal conduct and no additional or extrinsic evidence exists to give rise to a reasonable suspicion of predisposition, the government may not target that individual, no matter how distasteful the lawful conduct may be. Obviously, had the government learned, prior to targeting Jacobson, that he had purchased or had expressed a desire to purchase illegal materials or that he had otherwise engaged in illegal conduct, there would have been sufficient

cause to justify the decision to offer Jacobson the opportunity to purchase illegal materials through the mail.

This case is clearly distinguishable from the cases reaching the appellate level cited by the government in its brief. First, the government had received no information that Jacobson was purchasing illegal child pornography through the mails or that he was producing illegal child pornography. *See United States v. Emmert,* 829 F.2d 805, 807 (9th Cir.1987); *United States v. Irving,* 827 F.2d 390, 391 (8th Cir.1987); *United States v. Lard,* 734 F.2d 1290, 1292 (8th Cir.1984); *United States v. Thoma,* 726 F.2d 1191, 1194 (7th Cir.), *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984); *United States v. Leja,* 563 F.2d 244, 245 (6th Cir.1977), *cert. denied,* 434 U.S. 1074, 98 S.Ct. 1263, 55 L.Ed.2d 780 (1978). Second, Jacobson had never ordered or advertised for any illegal materials. *See United States v. Rubio,* 834 F.2d 442, 445 (5th Cir.1987); *United States v. Goodwin,* 674 F.Supp. 1211, 1213 (E.D.Va. 1987), *aff'd,* 854 F.2d 33 (4th Cir.1988). Third, the government did not inadvertently target Jacobson as a result of pre-existing investigations. *See United States v. Esch,* 832 F.2d 531, 533 (10th Cir.1987), *cert. denied,* 485 U.S. 908, 108 S.Ct. 1084, 99 L.Ed.2d 242 (1988); *United States v. Quinn,* 543 F.2d 640, 643 (8th Cir.1976). Fourth, there were no independent articulable facts that gave rise to the suspicion that Jacobson had committed a crime or was likely to commit a crime. *See United States v. Dawson,* 467 F.2d 668, 674 (8th Cir.1972), *cert. denied,* 410 U.S. 956, 93 S.Ct. 1427, 35 L.Ed.2d 689 (1973).

The government argues that, even if it did not have grounds for initially targeting Jacobson, his actions in response to the targeting indicated that he was predisposed to commit the crime, and his conviction should therefore be confirmed. We cannot agree. To accept this position would be to allow government agents to target entire groups of people without specific justification, hoping to uncover some individual who is predisposed to commit a crime if given enough opportunities to do so. The government must reasonably suspect that a crime has occurred or is likely to occur before targeting an individual. Evidence tending towards a reasonable suspicion obtained during an illegal targeting operation may be used to defend against a claim of entrapment only if received independent of the illegal sting operation. *Cf. Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). No such evidence exists in this case.

The government recognized that there must be limits on its power to investigate during its review of the ABSCAM sting operation. During congressional hearings, the Federal Bureau of Investigation (FBI) made clear that it had targeted only those persons who had been identified by a reliable source as predisposed to take or offer a bribe, thus giving rise to a reasonable suspicion that the targeted individuals would commit a crime if offered the opportunity to do so. Final Report of the Select Committee to Study Undercover Activities of Components of the Department of Justice, S.Rep. No. 682, 97th Cong., 2d Sess. 13 (1982).[1]

---

1. In each of the ABSCAM cases, reasonable suspicion does appear from the record. *United States v. Jenrette,* 744 F.2d 817 (D.C.Cir.1984); *United States v. Silvestri,* 719 F.2d 577 (2d Cir. 1983); *United States v. Ciuzio,* 718 F.2d 413 (D.C.Cir.1983), *cert. denied,* 465 U.S. 1034, 104 S.Ct. 1305, 79 L.Ed.2d 704 (1984); *United States v. Weisz, id.* (Ciuzio and Weisz were tried together); *United States v. Thompson,* 710 F.2d 915 (2d Cir.1983), *cert. denied,* 464 U.S. 1039, 104 S.Ct. 702, 79 L.Ed.2d 167 (1984); *United States v. Williams,* 705 F.2d 603 (2d Cir.), *cert. denied,* 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1984); *United States v. Kelly,* 707 F.2d 1460 (D.C.Cir.), *cert. denied,* 464 U.S. 908, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983); *United States v.*

*Myers,* 692 F.2d 823 (2d Cir.1982), *cert. denied,* 461 U.S. 961, 103 S.Ct. 2437, 77 L.Ed.2d 1322 (1983); *United States v. Carpentier,* 689 F.2d 21 (2d Cir.1982), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 957 (1983); *United States v. Alexandro,* 675 F.2d 34 (2d Cir.), *cert. denied,* 459 U.S. 835, 103 S.Ct. 78, 74 L.Ed.2d 75 (1982); *United States v. Jannotti,* 673 F.2d 578 (3d Cir.) (en banc), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). Only three of the cases, however, dealt specifically with the requirement of reasonable suspicion. *United States v. Kelly,* 707 F.2d 1460, 1471 (D.C.Cir. 1983) (without deciding whether reasonable suspicion is required, the court found that there

■ In our view, reasonable suspicion based on articulable facts is a threshold limitation on the authority of government agents to target an individual for an undercover sting operation. If a particular individual's conduct gives rise to reasonable suspicion, the government may conduct any undercover operation it so desires, as long as it does not give rise to a claim of outrageousness. *United States v. Lard,* 734 F.2d 1290, 1296–97 (8th Cir.1984). While the use of undercover operations is indispensible to the achievement of effective law enforcement, the potential harms of undercover operations call for the recognition that there must be some limitation on the indiscriminate use of such government targeting.[2]

At the time the government targeted Jacobson, it had no reason to believe that he was likely to commit an act which would violate federal obscenity laws. No evidence was subsequently obtained outside of the undercover operation. The evidence that Jacobson was predisposed to commit the crime for which he was convicted is tainted by the illegal targeting. We hold that Jacobson was entrapped as a matter of law. We therefore reverse his conviction and vacate his sentence.

FAGG, Circuit Judge, dissenting.

The panel has declared war on the government's power to initiate undercover investigations. Thus, I dissent.

I take issue with the panel's disinclination to apply the controlling standard of review. This court reviews the government's involvement in undercover investigations under due process principles. *United States v. Irving,* 827 F.2d 390, 393 (8th Cir.1987) (per curiam). The same is true of other courts of appeals. *See United States v. Luttrell,* 889 F.2d 806, 812–13 (9th Cir. 1989) (suspicionless undercover investigations offend due process); *United States v. Driscoll,* 852 F.2d 84, 87 (3d Cir.1988) (due process does not require probable cause for an undercover investigation); *United States v. Jenrette,* 744 F.2d 817, 823–24 & n. 13 (D.C.Cir.1984), *cert. denied,* 471 U.S. 1099, 105 S.Ct. 2321, 85 L.Ed.2d 840 (1985) (due process does not require reasonable suspicion of wrongdoing for an undercover investigation); *United States v. Gamble,* 737 F.2d 853, 856–60 (10th Cir. 1984) (same); *United States v. Myers,* 635 F.2d 932, 941 (2d Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980) (same).

Instead of deciding whether the government's conduct in formulating, implementing, and enmeshing Jacobson in the investigatory scheme was fundamentally unfair, *Irving,* 827 F.2d at 393, the panel has barred the government from obtaining a conviction because the undercover investigation was initiated without "reasonable suspicion based on articulable facts" that Jacobson had committed or was likely to commit a similar crime, *ante* at 999, 1000. This bar applies even when the overall character of the government's investigation "does not give rise to a claim of outrageousness." *Id.* at 1002. In my view, due process does not require an objectively quantified suspicion that approaches the threshold of probable cause. *See Garionis v. Newton,* 827 F.2d 306, 309 (8th Cir.1987). I believe the government can act on legitimately grounded suspicions without depriving the suspected person of any right secured by the constitution. The panel's demand for particularized suspicion runs against the grain "of the post-*Hampton* cases decided by the courts of appeals [holding] that due process grants wide leeway to law enforcement agents in their investigation of crime." *United States v. Kaminski,* 703 F.2d 1004, 1009 (7th Cir.

---

was ample suspicion to justify targeting Kelly); *United States v. Jannotti,* 673 F.2d 578, 609 (3d Cir.1982) (lack of reasonable suspicion does not offend due process); *United States v. Myers,* 635 F.2d 932, 941 (2d Cir.1980) (lack of reasonable suspicion does not offend due process or the speech or debate clause).

2. These potential harms include the creation of crime, the entrapment of innocent persons, the destruction of the reputations of innocent persons, extensive fishing expeditions among innocent citizens, the creation of an air of distrust amongst colleagues and acquaintances and the subjecting of government agents to tremendous temptations, dangers and stresses.

1983); *see also Hampton v. United States,* 425 U.S. 484, 495 n. 7, 96 S.Ct. 1646, 1653 n. 7, 48 L.Ed.2d 113 (1976) (Powell, J., concurring).

In my opinion, the panel has borrowed from the rule of probable cause to arrest, *Garionis,* 827 F.2d at 309, and from the rule of particularized suspicion that governs brief investigatory detentions, *Terry v. Ohio,* 392 U.S. 1, 16–19, 21, 88 S.Ct. 1868, 1877–1878, 1879, 20 L.Ed.2d 889 (1968), for the singular purpose of narrowing the government's power to initiate undercover investigations. Needless to say, law enforcement decisions to conduct undercover investigations are not controlled by fourth amendment doctrine. Furthermore, the terminology that functions as the backbone of the panel's rule "[is] not self-defining [and the terminology] fall[s] short of providing clear guidance dispositive of the myriad factual situations that arise" when the government invokes its investigative powers to penetrate the shadowy world of crime. *See United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981). At bottom, the panel's rulemaking runs squarely into "the difficulties attending the notion that due process of law can be embodied in fixed rules." *United States v. Russell,* 411 U.S. 423, 431, 93 S.Ct. 1637, 1642, 36 L.Ed.2d 366 (1973).

If the panel believes the government has violated due process by embarking on a suspicionless investigation against Jacobson, it should say so. *Luttrell,* 889 F.2d at 813. The record, however, does not support that conclusion. Indeed, on the record presented here the government's undercover investigation fits within the terms of the very rule the panel proposes.

The government possessed well-grounded reasons to believe that an investigation aimed at Jacobson would uncover criminal behavior. *Id.* at 814. Jacobson's name was found in the customer records of a reputed child pornographer. This discovery identified Jacobson as a person who had previously ordered child erotica through the mails. The customer records also disclosed that Jacobson had obtained a brochure outlining the methods of purchasing child pornography. With this information in the hands of experienced postal inspectors, I am at a loss to understand how the panel finds room to "criticize the government for reasonably pursuing available leads" concerning Jacobson's appetite for sexually explicit portrayals of children. *United States v. Hunt,* 749 F.2d 1078, 1087 (4th Cir.1984), *cert. denied,* 472 U.S. 1018 (1985). The panel concedes that Jacobson's response to a survey mailed to him by the postal inspectors "indicated a predisposition to receive through the mails sexually explicit materials depicting children," *ante* at 1000, and "justif[ied] the decision to offer Jacobson the opportunity to purchase illegal materials through the mail," *id.* at 1001.

It seems to me the panel is wearing blinders. This is not a case where the government was in the business of generating new crimes merely for the sake of pressing criminal charges against an individual who was "scrupulously conforming to the requirements of the law." *Luttrell,* 889 F.2d at 813. Jacobson was not targeted in advance. To the contrary, the government had a significant amount of knowledge about Jacobson's shadowy activities, and he was targeted for investigation because of his own voluntary conduct.

What the panel has chosen to ignore in this case is the practical reality that the investigatory process does not deal with hard certainties. Law enforcement officers are entitled to draw inferences, make deductions, and arrive at common sense conclusions about human behavior based on available information and the behavioral patterns of law breakers. *See Cortez,* 449 U.S. at 418–19, 101 S.Ct. at 695–96. The accumulated information must be "seen and weighed not in terms of [judicial post mortems], but as understood by those versed in the field of law enforcement." *Id.* at 418, 101 S.Ct. at 695. When the whole picture known to the postal inspectors is viewed in this context, the officers clearly possessed legitimate grounds for their suspicion of Jacobson and for their belief that an undercover approachment of Jacobson would reveal criminal activity.

*Id.* at 419, 101 S.Ct. at 695. "Here, fact on fact and clue on clue afforded a basis for the deductions and inferences that brought the officers to focus on [Jacobson]." *Id.* Simply stated, the panel is unwilling to acknowledge that it is looking at reasonable police work. *Id.*

Although the normal constitutional and statutory protections of criminal process have always been available to Jacobson, he necessarily wages his legal battle against the government's decision to investigate him as a question of law because the jury has rejected his entrapment defense. This court "may someday be presented with a situation in which the conduct of law enforcement agents [in initiating an undercover investigation] is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, [but Jacobson's case] is distinctly not of that breed." *Russell*, 411 U.S. at 431–32, 93 S.Ct. at 1643. I thus dissent from the panel's decision to overturn Jacobson's conviction.