UNITED STATES of America, Appellee,

v.

**Billie Dean GLEASON, Appellant.**

**No. 92–1154.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 16, 1992.

Decided Dec. 2, 1992.

---

S. Dean Price, Springfield, Mo., argued, for appellant.

Richard E. Monroe, Asst. U.S. Atty., Springfield, Mo., argued, for appellee.

Before BOWMAN, Circuit Judge, HEANEY, Senior Circuit Judge, and HANSEN, Circuit Judge.

BOWMAN, Circuit Judge.

Billie Dean Gleason was convicted after a two-day trial in District Court [1] of conspiracy to distribute methamphetamine and of four counts of distributing methamphetamine. He was sentenced to 132 months in prison, to be served consecutively to any existing sentences, and to be followed by eight years of supervised release. Gleason appeals, claiming his constitutional rights were violated because of outrageous government conduct in the events leading up to his arrest.[2] We affirm.

Gleason's argument is two-fold. First, he invokes his constitutional right and his federal statutory competence to be a witness on his own behalf, asserting that he was deprived of his rights because the District Court granted the government's motion in limine to exclude from the jury his evidence of alleged outrageous government conduct. Second, he claims that the government's conduct resulted in a violation of his due process rights, and that the District Court erred in denying his motion to dismiss the indictment.

Gleason's arrest resulted from an undercover investigation of activities at the Macomb, Missouri, residence of Gleason and his wife and codefendant in this case, Dottie Faye Gleason. The undercover agent was Corporal Jack McMullin of the Missouri State Highway Patrol. Confidential informant Mark "Junior" Mathews, Jr., introduced McMullin to Gleason as Mathews's friend "Jay."[3] Mathews had been

---

1. The Honorable Russell G. Clark, Senior United States District Judge for the Western District of Missouri.

2. Gleason was tried with his coconspirator and wife, Dottie Faye Gleason. She was convicted of conspiracy to distribute methamphetamine and of two counts of distributing methamphetamine, and she was sentenced to a prison term of sixty-three months. Dottie Faye Gleason filed an appeal and submitted briefs, but then filed a motion for voluntary dismissal of the appeal, which this Court has granted.

3. The transcript refers to the informant as "Mathew." Gleason's brief calls him "Matthews" and the government brief refers to him as "Mathews." The Missouri State Highway Patrol's "Conduct of Confidential Informant" instructions, executed by Mathews and reproduced in the government's addendum, shows that the informant signs his own name "Mathews." Thus we will use that spelling.

arrested in April 1990 on possession of methamphetamine charges, and soon after had become a paid government informant. Mathews had been acquainted with Gleason before 1990, and introduced McMullin as his friend in order to gain Gleason's trust of the undercover officer. McMullin, the government's key witness, testified to six occasions on which Billie or Dottie Gleason sold him methamphetamine, two of which involved Dottie alone since by the time they occurred Gleason already was incarcerated on drug charges that anteceded McMullin's undercover operation. On three occasions, the transactions were surreptitiously recorded, although the court deemed one of those recordings inadmissible at trial.

At the close of the government's case, the government moved to exclude from jury consideration all evidence of outrageous government conduct, arguing that the viability of the defense in a given case is a question of law for the court. The court granted leave to Gleason to argue his motion to dismiss the indictment for outrageous government conduct, notwithstanding Gleason's failure to file a pretrial motion. Billie Gleason testified out of the presence of the jury. Concluding, as a matter of law, that Gleason was not entitled to raise the outrageous government conduct defense, the court granted the government's motion in limine, Transcript at 119, 123, and denied Gleason's motion to dismiss the indictment. *Id.* at 121. Gleason put forward no other defense.

■ Gleason's first argument is that he was denied his right to testify on his own behalf because the court excluded from the jury all evidence of outrageous government conduct. The court correctly held that outrageous government conduct is a question of law for the court and that evidence of the defense is not properly submitted to the jury. *See United States v. Irving,* 827 F.2d 390, 393 (8th Cir.1987). The court in no way challenged Gleason's competence as a witness. The court's voir dire of Gleason guaranteed that he was fully aware of his right to testify, and that he was waiving that right voluntarily and

knowingly. *See Jackson v. United States,* 928 F.2d 245, 248 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 98, 116 L.Ed.2d 69 (1991); *United States v. Bernloehr,* 833 F.2d 749, 751 (8th Cir.1987).

Q (by the court): Mr. Gleason you understand, as a part of your defense, you have a right to testify. Do you understand that?

A (by Gleason): Yes, sir.

Q: If you do testify you will be under the rigors of cross-examination from the government's attorney. Do you understand that?

A: Yes, sir.

Q: Also, I believe you have previous convictions, do you not?

A: Yes, sir.

Q: Those can be brought out, you understand that?

A: Yes, sir.

Q: You think it's in your best interest not to testify?

A: Yes, sir.

Q: Have you consulted with [your attorney] relative to that?

A: Yes, sir.

Transcript at 132–33. The court went on to quiz Gleason's counsel, who acknowledged that, with the testimony concerning outrageous government conduct excluded, Gleason's "testimony would serve no purpose other than his impeachment by the government." *Id.* at 133.

Clearly, Gleason had "the right to take the witness stand and to testify in his ... own defense." *Rock v. Arkansas,* 483 U.S. 44, 49, 107 S.Ct. 2704, 2708, 97 L.Ed.2d 37 (1987). According to Gleason, the court could have ruled that outrageous government conduct was not a defense, while at the same time permitting him to testify on this subject. We fail to see, however, why Gleason should be permitted to offer testimony to the jury that is irrelevant to any issue before it in violation of the well-established rule that evidence shall not be admitted unless it is relevant. A defendant's right to testify on his own behalf is not without limits; that the proffered testimony should have relevance to something the jury must decide is clearly an appropri-

ate restriction. *See id.* at 55 & n. 11, 107 S.Ct. at 2711 n. 11 ("the right [of a criminal defendant] to present *relevant* testimony is not without limitation" and may be restricted by established rules of evidence) (emphasis added).

We hold that the court did not err in granting the government's motion in limine. We further hold that the court did not deprive Gleason of his constitutional right to testify in his own defense as a result of its decision on the motion. The court excluded only the evidence of outrageous government conduct and it was Gleason's decision—as demonstrated by the exchange with the court—that his testimony, with cross-examination, would be of greater harm than benefit to his case, a conclusion, we might add, often reached by defendants in criminal trials. Moreover, Gleason did testify, albeit only before the court, on his evidence of outrageous government conduct.[4]

Gleason also contends that the denial of his motion to dismiss the indictment because of outrageous government conduct was error. As this is a question of law, we review the court's decision *de novo. See Irving,* 827 F.2d at 393.

Gleason, in his proffer to the court,[5] testified that he became indebted to Mathews because Mathews put up a portion of Gleason's bond money when the two found themselves incarcerated in Webster County at the same time in March 1990. Soon after, Mathews began pressuring Gleason to repay the debt. As Gleason was unable to pay off all he owed, Mathews suggested several illegal activities (insurance fraud, grand theft) that he and Gleason might perpetrate together, but Gleason refused. Gleason acquiesced, however, to Mathews's suggestion that Gleason should deal drugs. According to Gleason, Mathews provided the methamphetamine, Gleason sold it to McMullin, and Gleason then paid the re-

ceipts over to Mathews. Gleason claims that, during this investigation, he never received methamphetamine from any other source, sold only to McMullin, and kept none of the proceeds of the sales.

There was evidence that, from May to September 1990, during the course of the conspiracy, Mathews was drunk (in McMullin's presence), took drugs, and carried firearms, all in violation of his agreement with the government as a confidential informant. The testimony was that McMullin did not approach the Gleasons (Billie by then was in prison on another drug charge) to purchase methamphetamine after August 1990, and that Mathews removed any remaining methamphetamine from the Gleason home in September 1990.

On August 9, 1990, McMullin asked Dottie Gleason, Billie's coconspirator, for more "fresh" methamphetamine than she had on hand. He did this in order to expand the investigation and send her to her source. Gleason argues that McMullin knew how much to ask for because he knew how much Mathews had left with Dottie. McMullin testified that Dottie had told him how much she had on hand and he then asked for more. Dottie's road trip to her source, monitored by government surveillance, was not to Mathews but to Tommy Bennett's mobile home. Thirty minutes after arriving, Dottie departed for home and told McMullin that she was unable to get any fresh methamphetamine, and that he could buy what she had. There was testimony that, in October or November 1990, after Mathews allegedly removed "his" methamphetamine from the Gleason home, Dottie gave approximately two grams of the drug over a period of a month and a half to Brad Brook, who was working on an addition to the Gleason residence.

The defense of outrageous government conduct, or entrapment as a matter of law,

---

**4.** Dottie Gleason, who was less vulnerable to impeachment, testified to much the same evidence that Billie Gleason proffered, without objection from the government or exclusion by the court. In addition to raising the outrageous government conduct defense, which was rejected by the trial court, Dottie Gleason raised the

defense of entrapment, a defense that was submitted to and rejected by the jury. Billie Gleason raised only the outrageous government conduct defense.

**5.** Dottie Gleason corroborated Billie's proffer when she testified before the jury.

was first suggested by the Supreme Court in 1973. *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). In *Russell*, the undercover government agent offered to supply the defendants with an essential and hard-to-find precursor ingredient for the manufacture of methamphetamine, in exchange for half of the drug produced and a look at the laboratory. The Court concluded, "While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, the instant case is distinctly not of that breed." *Id.* at 431–32, 93 S.Ct. at 1643 (citation omitted). This case is "not of that breed" either.

■ The defense of outrageous government conduct in violation of substantive due process, as distinct from entrapment as a matter of fact where predisposition defeats a defendant's resort to the defense, is now recognized by this Circuit. Thus, regardless of a defendant's predisposition, the government's conduct in promoting the commission of the crime may be so outrageous as to violate fundamental fairness. *United States v. Ford*, 918 F.2d 1343, 1349 (8th Cir.1990). The predisposed defendant, however, carries "a heavy burden of proving outrageousness on the part of the government, a requirement for establishing entrapment as a matter of law." *United States v. O'Malley*, 854 F.2d 1085, 1088 (8th Cir.1988).

Having studied the record in this case, we conclude that Gleason did not demonstrate that he was entitled to a dismissal of the indictment because of the government's conduct. The keystone of the defense is Gleason's allegation that Mathews was supplying the drugs Gleason was selling to McMullin. But Dottie Gleason's visit to Tommy Bennett and her gift of drugs to Brad Brook after Mathews allegedly had removed the supply of methamphetamine from the Gleasons' home are evidence that the Gleasons had other sources of the drug. Moreover, McMullin testified to receiving methamphetamine that Mathews

said he obtained from Gleason, and to discussing this with Gleason during a subsequent transaction.

Q (by the government): Trooper McMullin on the 30th of May of 1990, before the transaction where you received the methamphetamine from Billie Gleason, you received some methamphetamine from Junior [Mathews]; is that correct?

A (by McMullin): That's correct.

\* \* \* \* \* \*

Q: Now, when you spoke with Billie Gleason on the 30th about—at his residence, did he mention the eight ball [a measure of methamphetamine] from Junior?

A: He had mentioned, I believe, like it was the same stuff that Junior got last night, something like that.

\* \* \* \* \* \*

Q: And when you were buying material directly from Gleason on the 30th, did he warrant that it was the same as this that he had given Junior?

A: He said the same as the night before; yeah.

Transcript at 68–69. The evidence thus does not support Gleason's argument that Mathews was the sole source of the methamphetamine that Gleason sold to McMullin.

Gleason's convictions are affirmed.