UNITED STATES of America, Appellee,

v.

**Michael O. MYERS, Appellant.**

**No. 1557, Docket 80–1309.**

United States Court of Appeals,
Second Circuit.

Argued July 25, 1980.

Submitted Aug. 5, 1980.

Decided Aug. 8, 1980.

Certiorari Denied Nov. 3, 1980.
See 101 S.Ct. 364.

Neil E. Jokelson, Philadelphia, Pa. (Rochelle Newman, Philadelphia, Pa., Plato Cacheris, Washington, D. C., on brief), for appellant.

Edward R. Korman, U. S. Atty., Brooklyn, N. Y., for appellee.

Before VAN GRAAFEILAND and NEWMAN, Circuit Judges, and NEAHER, District Judge.*

NEWMAN, Circuit Judge:

The Executive Branch of the Government of the United States has carried out a plan to determine whether members of the Legislative Branch and others would commit bribery offenses if presented with the opportunity to do so. In a constitutional democracy this maneuver inevitably raises sensitive issues of public policy and public law. We are asked to consider some of those issues of law on this appeal by a Member of Congress from the denial of his motion to dismiss one of the so-called Abscam [1] indictments. After careful consideration of the issues raised on appeal at this pretrial stage of the case, we affirm the denial of the motion to dismiss the indictment.

### Facts

On May 27, 1980, a grand jury in the Eastern District of New York returned a three-count indictment against four defendants including appellant Michael O. Myers, United States Representative from the First Congressional District of Pennsylvania. The other defendants are Angelo J. Errichetti, the Mayor of Camden, N. J., and a New Jersey State Senator; Louis C. Johanson, a member of the Philadelphia City Council and a member of a Philadelphia law firm; and Howard L. Criden, a member of the same law firm.

The indictment alleges the following essential facts. Three agents of the Federal Bureau of Investigation and a private citizen, acting in an undercover capacity, purported to be representatives of Middle Eastern businessmen seeking to invest money in the United States and to immigrate to this country. Defendant Errichetti told one of the FBI agents that Congressman Myers would assist the "businessmen" to enter and remain in the United States in return for a cash payment of $100,000. Myers received from the FBI agent $50,000 in return for his promise both to introduce private immigration bills permitting the "businessmen" to remain in the United States and to take other necessary action including intervention with the State Department. Myers divided the $50,000 with the co-defendants, keeping $15,000 for himself. Later Myers, having been told by the co-defendants that his own share would be $50,000, met with two of the FBI agents and demanded and agreed to receive an additional $35,000. In the course of these events the defendants traveled from locations in Pennsylvania and New Jersey to locations within the Eastern District of New York, where the initial $50,000 was received.

The indictment alleges three offenses based on these facts. Count One alleges a conspiracy in violation of 18 U.S.C. § 371 (1976) to defraud the United States and to violate 18 U.S.C. § 201, punishing bribery and the receipt of bribes by public officials including Members of Congress. This count alleges that the conspiracy sought to defraud the United States of the Government's right (a) to the honest service of Congressman Myers "in relation to matters before the House of Representatives performed free from corruption . . ."; (b) to have the "official action" of Congressman Myers "in attempting to influence decisions of departments and agencies of the United States in relation to matters of immigration and residency performed free from corruption . . ."; (c) to have the immigration laws "administered honestly and impartially, free from improper and undue pressure and influence"; and (d) to have officials enforcing the immigration laws "perform their official duties free

---

* Of the United States District Court for the Eastern District of New York, sitting by designation.

1. "Abscam" is a coined word from the first two letters of "Abdul Enterprises Ltd.," the name given to the fictitious Middle Eastern business that the undercover agents invented for purposes of the investigation that led to these indictments, and the word "scam," a slang expression, perhaps derived from "scheme," meaning a confidence game or swindle. Webster's New World Dictionary 1270 (2d college ed. 1978).

from impairment and obstruction by the exercise upon them of corrupt . . . pressure and influence." The conspiracy to violate § 201 is alleged to consist of the defendants' agreeing to demand and receive money for Congressman Myers in return for the Congressman's "being influenced in his performance of official acts . . . ."

Count Two alleges that Congressman Myers, aided and abetted by the other co-defendants, sought and agreed to accept money in return for "being influenced in his performance of official acts as a member of Congress, to wit, his decisions and actions in a matter involving immigration, residency and citizenship of foreign nationals which might at any time be pending or which might by law be brought before the House of Representatives and departments" of the Government, in violation of 18 U.S.C. §§ 201(c) and 2. Count Three alleges that all four defendants traveled in interstate commerce to carry on the unlawful activity of bribery, in violation of 18 U.S.C. §§ 1952 and 2.

On June 10, 1980, Congressman Myers filed a motion to dismiss the indictment on various grounds, most of which assert constitutional objections grounded on either the Speech or Debate Clause, U.S. Const. art. I, § 6,[2] or the doctrine of separation of powers. On July 11, 1980, the motion was denied by the District Court for the Eastern District of New York (Jacob Mishler, Judge). Trial was scheduled for August 11, 1980. Myers appealed from the denial of his motion to dismiss on July 18, 1980. On July 22, 1980, the Government moved in this Court for summary affirmance. Since the next scheduled week in which fully submitted appeals are to be heard would not occur until August 18, after the scheduled trial date, this Court inquired of the parties whether they would be willing to argue the appeal on the merits on July 25,

1980, with an opportunity thereafter to submit briefs. There was no objection,[3] the appeal was heard on July 25, the appellant filed a brief on July 31, and the Government submitted a response on August 5.

### Appealability

In *Helstoski v. Meanor*, 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979), the Supreme Court ruled that a Congressman was entitled to appeal, in advance of trial, the denial of a motion to dismiss an indictment where the motion alleged violations of the Speech or Debate Clause. Analogizing from the Double Jeopardy Clause, see *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), the Court concluded that an appeal was available because the trial court's ruling had completely disposed of the defendant's claim and because the Speech or Debate Clause, when applicable, provides the kind of protection that should be vindicated by preventing a trial, rather than setting aside its outcome. Thus, appellant's contentions grounded on the Speech or Debate Clause are properly before us.

We also conclude that the reasoning of *Helstoski v. Meanor, supra*, entitles appellant to pre-trial review of his challenges to the indictment grounded on the doctrine of separation of powers. Though this doctrine does not provide as precise a protection as the Speech or Debate Clause, there are equivalent reasons for vindicating in advance of trial whatever protection it affords as a defense to prosecution on criminal charges. If, because of the separation of powers, a particular prosecution of a Member of Congress is constitutionally prohibited, the policies underlying that doctrine require that the Congressman be shielded from standing trial. Like the Speech or Debate Clause, the doctrine of separation of powers serves as a vital check upon the Executive and Judicial Branches to respect

**2.** The Speech or Debate Clause provides that "for any Speech or Debate in either House, they [Senators and Representatives] shall not be questioned in any other Place."

**3.** At oral argument counsel for appellant expressed a preference for additional time to brief

and argue this appeal, but acknowledged that he was prepared to argue the merits and, having submitted a full brief to the District Court, could file additional papers in this Court within a week.

the independence of the Legislative Branch, not merely for the benefit of the Members of Congress, but, more importantly, for the right of the people to be fully and fearlessly represented by their elected Senators and Congressmen.

Indeed, it would not be too extravagant to suggest that a Member of Congress should be entitled to pre-trial review of the denial of any legal claim that could be readily resolved before trial and would, if upheld, prevent trial or conviction on a pending indictment. Though every member of the public has an interest in avoiding the strain, expense, and injury to reputation resulting from a trial on criminal charges even if the ultimate outcome, at trial or on appeal, will be favorable, the interests of Members of Congress in this regard are especially compelling. Their ultimate vindication in an appeal after conviction will come long after serious, perhaps irreparable, political damage has been inflicted. Moreover, though the distress and distraction of a trial many prove burdensome to many ordinary defendants with adverse consequences for others in family, employment, or other relationships with them, the pendency of criminal charges against a Member of Congress and a trial of those charges implicate aspects of our representative form of government. The Member's capacity to represent his constituents is inevitably impaired. In the case of a Congressman, he is their sole voice and vote in the House of Representatives. Finally, the case for pre-trial review of legal defenses is bolstered by the same concerns that underlie the Speech or Debate Clause. The primary purpose for the appearance of that Clause in the Constitution was "to prevent intimidation by the executive and accountability before a possibly hostile judiciary." *United States v. Johnson*, 383 U.S. 169, 181, 86 S.Ct. 749, 755, 15 L.Ed.2d 681 (1966). The opportunity for intimidation by the prosecutors of the Executive Branch would be reduced by the knowledge that prosecutions encountering valid legal defenses will be promptly terminated by appellate courts before any trial has occurred.

Against these weighty concerns is only the traditional interest in judicial efficiency that normally precludes piecemeal appeals. See *Di Bella v. United States*, 369 U.S. 121, 82 S.Ct. 654, 7 L.Ed.2d 614 (1962); *Catlin v. United States*, 324 U.S. 229, 233–34, 65 S.Ct. 631, 633–634, 89 L.Ed. 911 (1945); *Cobbledick v. United States*, 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed. 783 (1940). That is a significant consideration in the general run of criminal litigation, but not very persuasive as to the extremely small class of criminal cases brought against Members of Congress. Moreover, it seems likely that when such cases arise, many of them, after *Helstoski v. Meanor, supra*, will precipitate pre-trial appeals grounded on the Speech or Debate Clause. Without questioning the general unavailability of pendent appellate jurisdiction, see *Abney v. United States, supra*, 431 U.S. at 663, 97 S.Ct. at 2042, we simply note that little would be lost in the way of judicial efficiency if pre-trial appeals by indicted Members of Congress were to include all legal defenses.

We need not determine the full extent of pre-trial appellate jurisdiction in such cases. The claims of Congressman Myers are, with one exception, all grounded on either the Speech or Debate Clause or the doctrine of separation of powers, as to which appellate jurisdiction is either governed by or follows from *Helstoski v. Meanor, supra*. The one exception is the claim that the indictment fails to state an offense under 18 U.S.C. § 201 because of the Government's role and the fictitious nature of the scheme in connection with which the offense was allegedly committed. We have concluded that it is appropriate to accept pre-trial appellate jurisdiction of this claim, determinable from the face of the indictment, along with the other issues.

### The Merits

The merits of appellant's various contentions may conveniently be considered under three broad headings: challenges to the facial validity of § 201, challenges to the validity of § 201 as applied to the facts alleged in this indictment, and procedural challenges.

■ 1. Facial validity of § 201. Appellant challenges the facial validity of § 201 on the grounds that the statute conflicts with the Speech or Debate Clause and the doctrine of separation of powers. These claims are wholly without merit in light of *United States v. Brewster*, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972), and *United States v. Johnson, supra*. Those decisions squarely uphold the constitutional authority of Congress to enact § 201, creating the offense of bribery, including bribery of a Member of Congress. The decisions recognize that the Speech or Debate Clause imposes significant limits on the prosecution of congressional bribery. Conduct that falls within the broad category of legislative action may not be charged as an offense under the statute, nor may evidence of a Member's legislative action be offered in evidence against him. *United States v. Brewster, supra*, 408 U.S. at 510, 92 S.Ct. at 2536; *United States v. Johnson, supra*, 383 U.S. at 184–85, 86 S.Ct. at 757–758; *United States v. Helstoski*, 442 U.S. 477, 99 S.Ct. 2432, 61 L.Ed.2d 12 (1979). But despite these limits, the facial validity of § 201 is clear.

■ 2. Validity of § 201 as applied. Appellant next mounts a series of constitutional and statutory challenges to the validity of § 201 as applied to the facts alleged in the pending indictment. *United States v. Brewster, supra*, completely disposes of appellant's claim that the references in the indictment to legislative actions render the indictment invalid under the Speech or Debate Clause. As *Brewster* makes clear, "Taking a bribe is, obviously, no part of the legislative process or function," 408 U.S. at 526, 92 S.Ct. at 2544, and an indictment may validly allege a corrupt promise to take legislative action, even though the action itself is immune from prosecution. This case is unlike *Johnson*, where the prosecu-

tion was "dependent" on prohibited inquiries as to the circumstances surrounding and motivation for legislative action, there a speech on the House floor, 383 U.S. at 184, 86 S.Ct. at 757, and precisely like *Brewster*, where the indictment alleged acceptance of money in return for a promise to take legislative action. This indictment charges Congressman Myers with accepting $15,000 and demanding an additional $35,000 for a promise to take further official action, including the enactment of private immigration bills. This indictment focuses the inquiry squarely on whether the money was taken and whether a corrupt promise was made.[4] Legislative actions are referred to in the indictment only for the entirely permissible purpose of detailing the nature of the corrupt promise allegedly made. The indictment contemplates no inquiry into the taking of any legislative action or the motivation for it.

*Brewster* is also a complete answer to appellant's next point that the conduct alleged in the indictment may not be prosecuted because it is "disorderly behavior" within the meaning of Article I, Section 5, Clause 2 of the Constitution, authorizing each House of the Congress to punish its Members.[5] The argument that acceptance of a bribe by a Member of Congress was peculiarly a matter appropriate for punishment exclusively by each House of the Congress was vigorously made in the dissenting opinions in *Brewster*, 408 U.S. at 541–44, 92 S.Ct. at 2551–2553 (Brennan, J., dissenting); *id.* at 551–52, 563, 92 S.Ct. at 2556–2557 (White, J., dissenting). The arguments focused primarily on the Speech or Debate Clause, relying on the Behavior Clause to show that immunity from Executive Branch prosecution did not insulate Members of Congress who corrupt the legislative process from the sanctions of their peers. In declining to find in the Speech or Debate

---

4. The Fourth Circuit has ruled that portions of an indictment, though not in terms alleging conduct protected by the Speech or Debate Clause, may be shown to refer to protected conduct when assessed in light of evidence at trial. *United States v. Dowdy*, 479 F.2d 213, 223–24 (4th Cir.), *cert. denied*, 414 U.S. 823, 94 S.Ct. 124, 38 L.Ed.2d 56 (1973). At this stage of this case, our review is limited to the face of the indictment.

5. The Disorderly Behavior Clause provides that "Each house may . . . punish its Members for disorderly Behaviour."

Clause an immunity from prosecution for corrupt promises to take legislative action, the majority in *Brewster* necessarily rejected any contention that Congressional punishment power in such matters was exclusive. See also *Burton v. United States*, 202 U.S. 344, 367, 26 S.Ct. 688, 693, 50 L.Ed. 1057 (1906).

Appellant's final attack on the indictment's application of § 201 is not without substance. He contends that the statute may not be validly applied to an alleged bribe instigated by agents of the Executive Branch creating fictitious roles and a fictitious plot. This contention is based on both constitutional and statutory grounds. The constitutional attack proceeds primarily from the doctrine of separation of powers, as illuminated by the policy underlying the Speech or Debate Clause to protect Members of Congress from intimidation by the Executive Branch. The statutory argument is simply that Congress has not authorized use of § 201 by agents of the Executive Branch to create fictitious situations to see if a Member of Congress might succumb to the temptation to accept a bribe. Before considering the merits of these constitutional and statutory arguments, it is important to bear in mind that they are conceptually and factually distinct from the traditional defense of entrapment, which will be available to defendant at trial if the evidence shows sufficient inducement by the FBI agents to shift to the Government the burden of proving the defendant's predisposition to commit the offenses charged. See *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). At this stage the defendant is not alleging entrapment;[6] his point is that the Constitution forbids or, alternatively, the statute does not authorize the Executive Branch to conduct a "scam" or "sting" operation to see if Members of Congress, without any inducement, will accept bribes.

The constitutional argument focuses essentially upon the risk of abuse.[7] If agents of the Government can confront Members of Congress with manufactured opportunities to accept bribes, there is created the risk that malevolent officials of the Executive Branch will one day select as targets for a bribery sting particular Senators or Representatives in political disfavor with

---

**6.** At the July 11 hearing before Judge Mishler, Congressman Myers, joining with defendants indicted in other Abscam cases, also contended that the indictment should be dismissed because the tactics used by the Government during its involvement in the criminal activity reached that "demonstrable level of outrageousness" that violates the Due Process Clause. *Hampton v. United States*, 425 U.S. 484, 495 n.7, 96 S.Ct. 1646, 1653 n.7, 48 L.Ed.2d 113 (1976) (Powell, J., concurring). In *Hampton* a three-member plurality acknowledged the possibility of a due process defense based on outrageous law enforcement conduct, but appeared to indicate that, as with the entrapment defense, the defendant's predisposition to commit the crime would make the due process defense unavailable. *Id.* at 490–91, 96 S.Ct. at 1650–1651. However, five members of the Court indicated that a due process defense, based on outrageous law enforcement conduct, would be available and would not be defeated by evidence of the defendant's predisposition. *Id.* at 493–95, 96 S.Ct. at 1651–1653 (Powell, J., with whom Blackmun, J., concurs, concurring), 497, 96 S.Ct. at 1653–1654 (Brennan, J., with whom Stewart and Marshall, JJ., concur, dissenting). The due process defense has been upheld by a divided panel of the Third Circuit, *United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978). *See also United States v. Archer*, 486 F.2d 670, 676–77 (2d Cir. 1973).

Judge Mishler took under advisement the motion to dismiss on due process grounds and the request for an evidentiary hearing in support of that claim. The due process claim is not before us on this appeal, and we express no views on its merit or whether, in the event of denial, it would be reviewable before trial.

**7.** A possible additional argument is that a bribery sting subjects Members of Congress to the risk of erroneous conviction. While no system of law enforcement can totally eliminate that risk, it is difficult to believe that the risk is enhanced by a sting operation. On the contrary, because the operation is planned by government agents and can be carried out, as this one was, with a film or videotape record of critical events, the chances of an erroneous conviction would seem to be markedly less than in "real" bribe cases, where frequently the only available evidence is the discreditable testimony of the person who paid the bribe.

the President.[8] The argument further maintains that if this occurs, such political targeting, though doubtless prohibited by the First Amendment, *cf. United States v. Steele*, 461 F.2d 1148 (9th Cir. 1972), will be infrequently detected. The argument does not assert that Members of Congress have a constitutional immunity from prosecution for bribery. It simply maintains that the public interest in deterring bribery of Members of Congress can be adequately served by prosecution of those who accept bribes under "real" circumstances, without the added threat of prosecution for bribes accepted in response to manufactured opportunities.

Forceful arguments are available in response to these concerns. Any Member of Congress approached by agents conducting a bribery sting operation can simply say "No." Each Member's capacity to reject bribe opportunities could be regarded as sufficient safeguard against the risk that the Executive Branch would successfully use these tactics for political reprisal. Additionally, as the Government points out, bribery is a secretive enterprise, not likely to be detected as long as the bribe giver and taker maintain their silence. A sting operation, it is urged, provides a needed law enforcement weapon. Finally, emphasis is placed on the high public interest in guarding against corruption in the legislative process. The known availability of a bribery sting can act as a powerful deterrent.

Having examined these competing considerations, we conclude that they involve choices of public policy, rather than constitutional imperatives. Once the Supreme Court decided in *Brewster* that the Constitution does not prevent Congress from applying the criminal law enforcement process to a Member's acceptance of a bribe in return for a promise of legislative action, the way was cleared for that process to function without any special constitutional restraints arising from the status of the defendant. The normal constitutional and statutory protections of the criminal process of course remain available to the accused. Those protections include the defense of entrapment, but that defense is not established simply because government agents "afford opportunities or facilities for the commission of the offense," *Sorrells v. United States, supra,* 287 U.S. at 441, 53 S.Ct. at 212, or engage in "deceit." *United States v. Russell*, 411 U.S. 423, 436, 93 S.Ct. 1637, 1645, 36 L.Ed.2d 366 (1973). If the public policy concerns that have been identified warrant additional restrictions on the prosecution of Members of Congress for bribery, such restrictions are matters for consideration by those with public policy responsibilities, administrators in the Executive Branch and ultimately law-makers in the Legislative Branch. In *Brewster* the Supreme Court pointed out that if that decision underestimated "the potential for harassment, the Congress, of course, is free to exempt its Members from the ambit of federal bribery laws." 408 U.S. at 524, 92 S.Ct. at 2543. By the same token, if the risks of a bribery sting operation outweigh its benefits, Congress always has the power to make the more limited modification of redefining the offense to exclude, in the case of Members of Congress or others, acceptance of bribes offered by undercover agents of the Government. With the policy choice thus fully within the control of Congress, we cannot conclude that the separation of powers doctrine creates a constitutional barrier to the law enforcement technique selected by the Executive Branch.[9]

Appellant's statutory objection to a bribery sting operation is also unavailing. Section 201 in terms neither expressly authorizes nor prohibits a bribery prosecution founded on a government agent's offer of money. Thus, the question is whether we should read into the statute a limitation of such prosecutions in the absence of explicit authorization, or apply the statute without

---

**8.** Appellant also claims that this has occurred in this case, a point considered *infra*.

**9.** Appellant also seeks to bolster his challenge to a bribery sting operation by contending that a prosecution founded on this technique presents a political question inappropriate for the Judicial Branch. This is simply another way of characterizing the public policy issues that are available for resolution by Congress.

such limitation until such time as Congress explicitly places it there. We conclude that the latter approach is more consonant with a court's traditional role in statutory interpretation. Congress first defined the offense of bribery of a Member in 1862. Ch. 180, 12 Stat. 577. In 1962 Congress recodified and consolidated various bribery statutes into one comprehensive law (now § 201 of the Criminal Code) punishing bribery of any "officer or employee" of the United States, specifically including Members of Congress. Pub.L.No. 87–849, 76 Stat. 1119. The broad coverage of § 201 precludes any interpretation that it contains within it a limitation on the manner of prosecution of one category of persons covered. On the contrary, the Senate Report on the 1962 bill specifically noted that it "would not restrict the broad scope of the present bribery statutes as construed by the courts." S.Rep.No. 2213, 87th Cong., 2d Sess. 4 (1962), U.S.Code Cong. & Admin.News 1962, pp. 3852, 3853. That broad scope includes the full range of investigative techniques, including undercover activity.

Appellant also contends that the indictment fails to allege an offense covered by § 201 because of the fictitious circumstances surrounding the corrupt promise allegedly made. This claim is without merit. The offense described by § 201 is complete upon a Congressman's corrupt acceptance of money in return for his promise to perform any official act. The elements of the offense are the receipt of money, the making of the promise, and the corrupt purpose with which these things are done. *United States v. Brewster, supra,* 408 U.S. at 526–27, 92 S.Ct. at 2544–2545. The promise does not cease to relate to an official act simply because the undercover agent offering the bribe knows that the subject of the promised legislative action is fictitious and that the promise will not actually be performed. The statute condemns the Congressman's actions and state of mind. His alleged promise to introduce private immigration bills is a promise to perform "any official act." 18 U.S.C. § 201(c).

3. Procedural challenges. Appellant's first procedural challenge claims that he is the victim of selective prosecution of

"disfavored legislators." (Motion to dismiss, ¶ 26). Viewed as a traditional challenge to the discriminatory enforcement of the criminal law, see *United States v. Berrios,* 501 F.2d 1207 (2d Cir. 1974), the claim was properly rejected by the District Court. To shift to the Government the burden of proving that a decision to prosecute is free of discriminatory taint, a defendant must show "(1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i. e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights." *Id.* at 1211 and cases there cited. Appellant has made no claim whatever that any others similarly situated have not been prosecuted, nor has he supplied by affidavit or otherwise any support for his conclusory allegation that he is a "disfavored" legislator. Frequent opposition to the Administration and some indication of the Administration's displeasure would be matters readily within the knowledge of a "disfavored" legislator.

However, it seems clear from appellant's written and oral arguments that his selective prosecution claim extends beyond the traditional challenge to an improperly motivated prosecution. Again emphasizing the policy of the Speech or Debate Clause to prevent the Executive Branch from intimidating Members of Congress, appellant asserts that intimidation inheres in a bribery sting prosecution simply because the Executive Branch retains the discretion to decide which Members of Congress will be confronted with the opportunity to accept a bribe. Though "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation," *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962), appellant maintains that unfettered discretion does encounter constitutional barriers in the circumstances alleged to have occurred in this indictment. The consequence of this argument need not be an immunity of Members

of Congress from bribery stings initiated by the Executive Branch; one appropriate safeguard might simply be a requirement that the Executive Branch demonstrate some basis of suspicion (short of probable cause) before deciding to make any Member of Congress the target of a sting.

Without assessing the public policy merit of such a safeguard, we conclude that it is not required by the Constitution. The Speech or Debate Clause limits the conduct of a Member that may be made the basis of a prosecution and limits the evidence that may be used against him, the equal protection principle of the Fifth Amendment's Due Process Clause and the First Amendment protect a Member against a prosecution improperly motivated, the entrapment defense and very likely the Due Process Clause protect a Member against a prosecution improperly conducted, and the Fifth Amendment assures a Member that no prosecution may be initiated unless a Grand Jury returns an indictment. Just as we have left to Congress the public policy choice of whether to prevent sting operations, we find it equally appropriate to let Congress determine whether to create any special requirements for the initiation of such operations.

 Appellant's second procedural claim is that the indictment should be dismissed because the grand jury that returned it heard some evidence of legislative acts that is privileged by the Speech or Debate Clause. Normally, an indictment is not subject to dismissal on the ground that there was "inadequate or incompetent" evidence before the grand jury. *Costello v. United States,* 350 U.S. 359, 362, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956). This rule has been specifically applied to reject a claim that a grand jury heard some evidence protected by the Speech or Debate Clause. *United States v. Johnson,* 419 F.2d 56 (4th Cir. 1969), *cert. denied,* 397 U.S. 1010, 90

S.Ct. 1235, 25 L.Ed.2d 423 (1970). See also *United States v. Helstoski,* 576 F.2d 511, 519 (3d Cir. 1978), *aff'd without consideration of this point, sub nom. Helstoski v. Meanor,* 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979); contra, *United States v. Helstoski,* Crim. No. 76–201 (D.N.J. Feb. 27, 1980) (unpublished). The procedural history of *Johnson* makes it especially instructive. Congressman Johnson's original conviction on both substantive and conspiracy counts was reversed by the Fourth Circuit. 337 F.2d 180 (1964). The Supreme Court agreed that retrial was necessary because a portion of the conspiracy count specifically charged conduct protected by the Speech or Debate Clause. 383 U.S. at 176–77, 86 S.Ct. at 753–754. However, the Supreme Court remanded for a new trial on the original indictment, requiring only deletion of that portion of the indictment charging protected conduct. *Id.* at 185, 86 S.Ct. at 757–758. Though the grand jury that had returned the indictment obviously had heard evidence of the protected conduct, which it had specifically alleged to be part of the conspiracy, the Supreme Court raised no objection to retrial on the redacted indictment. On appeal from Johnson's second conviction, the Fourth Circuit considered and rejected his challenge to the grand jury's receipt of privileged evidence. 419 F.2d at 58. We agree with the conclusion reached by the Fourth Circuit, which appears to be the implicit conclusion of the Supreme Court as well.[10]

 Appellant's final procedural point is that the indictment should be dismissed because it "requires and/or contemplates the government to present and/or the defense to have the opportunity to present" at trial evidence protected by the Speech or Debate Clause. (Motion to dismiss ¶ 9). The prohibition against the Government's use of privileged evidence is clear, *United States v. Brewster, supra ; United States v. Helstoski, supra.* Since the indictment

---

**10.** We need not consider whether an indictment might be subject to a motion to dismiss in the event that the privileged evidence constituted such a large proportion of the evidence before the grand jury as to raise a substantial question of whether the grand jury had sufficient competent evidence to establish probable

cause. In this case Judge Mishler noted at the argument on defendant's motion to dismiss that extensive tapes and recordings were before the grand jury, referring to the episodes in which money was received allegedly in return for corrupt promises. (Tr. July 11, 1980 hearing 37).

alleges a promise to perform a legislative act and not the performance of the act, there is no reason to assume that at trial the Government will be unable to abide by the constitutional restriction upon its evidence. Whether the appellant will choose to offer evidence of his own legislative acts is, at this point, a matter of speculation. Even should he elect to do so, we do not believe his introduction of such otherwise privileged evidence would violate the Speech or Debate Clause. The protection against being "questioned" outside of Congress prevents the use of legislative acts against a Member. It does not prevent him from offering such acts in his own defense, even though he thereby subjects himself to cross-examination.

In sum, we recognize that the initiation of this prosecution raises sensitive issues of public policy, matters well worth the thoughtful consideration of the public and their elected representatives. Our task, however, is confined to determining whether the limits of the Constitution and the law have been exceeded. Satisfied that they have not, we affirm the order denying dismissal of the indictment. The mandate shall issue forthwith.