**UNITED STATES of America, Appellee,**

v.

**Keith M. JACOBSON, Appellant.**

**No. 88–2097NE.**

United States Court of Appeals,
Eighth Circuit.

Submitted May 17, 1990.

Decided Oct. 15, 1990.

George H. Moyer, Jr., Madison, Neb., for appellant.

Jan W. Sharp, Omaha, Neb., for appellee.

Before LAY, Chief Judge, HEANEY, Senior Circuit Judge, and McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN, MAGILL and BEAM, Circuit Judges, En Banc.

FAGG, Circuit Judge.

A jury convicted Keith M. Jacobson of knowingly receiving through the mails sexually explicit material depicting a minor. *See* 18 U.S.C. § 2252(a)(2) (Supp. V 1987). Jacobson appeals, and we affirm.

When police searched a California pornography bookstore, they discovered Jacobson's name on the bookstore's mailing list. Jacobson had ordered three items from the bookstore, two magazines featuring photos of nude adolescent boys and a brochure listing stores in the United States and Europe selling sexually explicit materials. Posing as a member of a hedonist organization, a postal inspector mailed Jacobson a sexual attitude survey and a membership application. Jacobson paid the membership fee to receive a quarterly newsletter from the organization and returned the survey expressing his preference for preteen sex. Later, a postal inspector mailed Jacobson another survey. Jacobson responded positively, "Please feel free to send me more information. I am interested in teenage sexuality." The postal inspector then mailed Jacobson a list of pen pals with similar sexual interests, and Jacobson began corresponding with pen pal Carl Long, the undercover identity of a postal inspector. Jacobson sent Carl Long a newspaper for homosexuals and two letters. Another postal inspector sent Jacobson a letter inviting him to order a child pornography catalogue. Jacobson requested the catalogue and then ordered *Boys Who Love Boys*, a magazine advertised in the catalogue. The catalogue described *Boys Who Love Boys* as "eleven year old and fourteen year old boys get it on in every way possible. Oral, anal sex and heavy masturbation. If you love boys, you will be delighted with this." Jacobson also ordered a set of sexually explicit photographs of young boys from another brochure a customs service agent mailed him. The photographs were never delivered to Jacobson. Following a controlled delivery of the magazine, postal inspectors arrested Jacobson when they searched his home and found *Boys Who Love Boys*.

All told, the postal inspectors mailed Jacobson two sexual attitude surveys, seven letters measuring his appetite for child pornography, and two sex catalogues. Jacobson responded with interest on eight occasions.

On appeal, Jacobson contends the government cannot begin an undercover investigation of a suspected person unless the government has reasonable suspicion based on articulable facts that the suspected person is predisposed to criminal activity. Although Jacobson did not raise this legal issue in the district court, both the government and Jacobson were given an opportunity to brief and argue the issue before the court en banc. We thus proceed on the premise that this issue is properly before us. *In re Modern Textile*, 900 F.2d 1184, 1191 (8th Cir.1990).

Apart from any question of whether the government's investigatory conduct deprived Jacobson of due process of law, Jacobson contends we should bar the government from obtaining a conviction in his case because the government did not have reasonable suspicion of wrongdoing on his part before targeting him for an undercover investigation. Jacobson argues this bar should apply even when the character of the government's investigation is not outrageous. We disagree.

In this circuit, we review the government's involvement in undercover investigations under due process principles. *United States v. Irving*, 827 F.2d 390, 393 (8th Cir.1987) (per curiam). The same is true of other courts of appeals. *See United States v. Miller*, 891 F.2d 1265, 1267

(7th Cir.1989); *United States v. Driscoll*, 852 F.2d 84, 86–87 (3d Cir.1988); *United States v. Jenrette*, 744 F.2d 817, 823–24 & n. 13 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1099, 105 S.Ct. 2321, 85 L.Ed.2d 840 (1985); *United States v. Gamble*, 737 F.2d 853, 856–60 (10th Cir.1984); *United States v. Myers*, 635 F.2d 932, 941 (2d Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980).

Due process limitations "come into play only when the [g]overnment activity in question violates some protected right of the defendant." *Hampton v. United States*, 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976) (emphasis omitted). Jacobson has no constitutional right to be free of investigation. *United States v. Trayer*, 898 F.2d 805, 808 (D.C.Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 113, 112 L.Ed.2d 83 (1990). Indeed, Jacobson does not claim the government's decision to investigate him deprived him of any right secured by the constitution. Nevertheless, Jacobson borrows from the rule of particularized suspicion that governs investigatory detentions, *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968), to narrow the government's power to initiate undercover investigations. There is no constitutional basis for this borrowing since the government's decision to investigate Jacobson did not encroach on Jacobson's "right to personal security." *Id.* at 9, 88 S.Ct. at 1873. Jacobson's demand for particularized suspicion runs against the grain "of the post-*Hampton* cases decided by the courts of appeals [holding] that due process grants wide leeway to law enforcement agen[ts] in their investigation of crime." *United States v. Kaminski*, 703 F.2d 1004, 1009 (7th Cir.1983); *see also Hampton*, 425 U.S. at 495 n. 7, 96 S.Ct. at 1653 n. 7 (Powell, J., concurring).

■■■ We thus join with the courts of appeals that hold the constitution does not require reasonable suspicion of wrongdoing before the government can begin an undercover investigation. *See Jenrette*, 744 F.2d at 824 & n. 13; *Gamble*, 737 F.2d at 860; *United States v. Thoma*, 726 F.2d 1191, 1198–99 (7th Cir.), *cert. denied*, 467 U.S.

1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984); *United States v. Jannotti*, 673 F.2d 578, 609 (3d Cir.) (en banc), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *Myers*, 635 F.2d at 941; *see also United States v. Steinhorn*, 739 F.Supp. 268 (D.Md.1990). *But see United States v. Luttrell*, 889 F.2d 806, 812–14 (9th Cir. 1989) (constitutional norms require reasoned grounds for undercover investigations), *reh'g en banc granted*, 906 F.2d 1384 (1990). To hold otherwise would give the federal judiciary an unauthorized "veto over law enforcement practices of which it [does] not approve." *United States v. Russell*, 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973); *see also United States v. Lovasco*, 431 U.S. 783, 790, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977) (judges are not free to impose their personal notions of fairness on law enforcement officers under the guise of due process). In our view, when the government's investigatory conduct does not offend due process, the mere fact the undercover investigation is started without reasonable suspicion "does not bar the conviction of those who rise to its bait." *Jannotti*, 673 F.2d at 609.

■■■ Jacobson next contends the government's investigatory conduct was outrageous and violated his due process rights. This contention is without merit. We recognize due process bars the government from invoking judicial process to obtain a conviction when the investigatory conduct of law enforcement agents is outrageous. *Gunderson v. Schlueter*, 904 F.2d 407, 410–11 (8th Cir.1990) (citing *Hampton*, 425 U.S. at 492–95, 96 S.Ct. at 1651–53 (Powell, J., concurring); *Russell*, 411 U.S. at 431–32, 93 S.Ct. at 1642–43). Because the government may go a long way in concert with the investigated person without violating due process, *United States v. Musslyn*, 865 F.2d 945, 947 (8th Cir.1989) (per curiam), the level of outrageousness needed to prove a due process violation "is quite high," *Gunderson*, 904 F.2d at 410. Indeed, the government's behavior must shock the conscience of the court. *Id.* (citing *Rochin v. California*,

342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952)).

■ We simply cannot characterize the government's conduct in Jacobson's case as outrageous. Having discovered Jacobson's name on a pornographer's mailing list, the government pursued its investigation over a period of twenty-nine months by mailing surveys, letters, and catalogues to Jacobson. Jacobson responded, remitting a membership fee, requesting more information, corresponding with another adult sharing his interest in child erotica, and finally ordering obscene magazines and photographs depicting "young boys in sex action fun." The postal inspectors did not apply extraordinary pressure on Jacobson. The inspectors merely invited Jacobson to purchase pornographic material through the mail. See Kaminski, 703 F.2d at 1009 (the offer of reasonable inducements is a proper means of investigation). Unlike face-to-face contacts, Jacobson easily could have ignored the contents of the mailings if he was not interested in them. Similar undercover operations aimed at child pornography collectors "have withstood the constitutional challenge [Jacobson] now raises." Musslyn, 865 F.2d at 947 (citations omitted).

■ Jacobson also contends he was entrapped as a matter of law. We cannot agree. The jury rejected Jacobson's entrapment defense. Jacobson argues, however, the evidence clearly shows entrapment: the postal inspectors originated the criminal plan, implanted the disposition to purchase child pornography into Jacobson's otherwise innocent mind, and Jacobson ordered the illegal magazine at their behest. See United States v. Pfeffer, 901 F.2d 654, 656 (8th Cir.1990). We view the evidence in the light most favorable to the government in deciding whether there is a jury issue on entrapment, id., and having done so, we conclude this is not a case in which the government was a manufacturer rather than a detector of crime.

Entrapment is established as a matter of law only when the absence of defendant's predisposition to commit a crime is apparent from the uncontradicted evidence.

Thoma, 726 F.2d at 1197. Having considered the factors that bear on a criminal defendant's predisposition, id., we are convinced the district court properly submitted the question of Jacobson's entrapment to the jury. The government presented ample evidence that the postal inspectors only provided Jacobson with opportunities to purchase child pornography and renewed their efforts from time to time as Jacobson responded to their solicitations. Indeed, the panel's opinion recognized Jacobson's response to a survey mailed to him by the postal inspectors "indicated a predisposition to receive through the mails sexually explicit materials depicting children," United States v. Jacobson, 893 F.2d 999, 1000 (8th Cir.1990), and "justif[ied] the decision to offer Jacobson the opportunity to purchase illegal materials through the mail," id. at 1001. Jacobson was not entrapped as a matter of law.

Finally, Jacobson contends the district court committed error in admitting certain evidence and in failing properly to instruct the jury. We have carefully considered these contentions and find them without merit.

We thus affirm Jacobson's conviction.

LAY, Chief Judge, dissenting.

In Hampton v. United States, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1975), the Supreme Court recognized that "the entrapment defense 'focus[es] on the intent or predisposition of the defendant to commit the crime,' rather than upon the conduct of the Government's agents." Id. at 488, 96 S.Ct. at 1649 (quoting United States v. Russell, 411 U.S. 423, 429, 93 S.Ct. 1637, 1641, 36 L.Ed.2d 366 (1973)); see also United States v. Thoma, 726 F.2d 1191, 1197 (7th Cir.1984), cert. denied, 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984) (entrapment is established as a matter of law if the uncontroverted evidence indicates that a defendant was not predisposed to commit a crime).

In the present case, it is clear the government entrapped Jacobson as a matter of law. Jacobson is a fifty-seven year old

farmer from Newman Grove, Nebraska. Prior to his conviction, Jacobson's criminal record reflected only a 1958 conviction for driving while under the influence.

On February 4, 1984, Jacobson *lawfully* ordered from Dennis Odom, a California businessman, two nudist magazines and a brochure. Several months later, the government obtained Odom's mailing list, which included Jacobson's name. Although the government possessed no information that Jacobson had previously purchased obscene materials, he nevertheless became the target of five undercover sting operations. Over a period of two and one-half years, the government, using as a subterfuge various fictitious organizations, repeatedly solicited Jacobson through the mail to purchase illegal pornography. Jacobson finally succumbed to the government's pressure by ordering "Boys Who Love Boys," a pornographic magazine.

From the uncontroverted facts in this case, it is readily apparent that Jacobson was not predisposed to commit the crime of receiving through the mails sexually explicit materials depicting a minor. The government contends that Jacobson had the requisite predisposition based on his answer to a survey that indicated he was interested in pre-teen sex magazines. Jacobson's response merely demonstrates that the government set out to entrap him because he had legally ordered two magazines that later proved to be obscene. Based on Jacobson's prior history, it is not clear that he would knowingly and voluntarily violate the law by purchasing obscene materials. The evidence fails to show that Jacobson was predisposed to commit the crime of which he was ultimately convicted.

I find the government's conduct in this case to be reprehensible. The government invested considerable time and money to prosecute a man who never would have committed a crime but for the government's encouragement. The government should not concentrate its efforts on incriminating innocent individuals; rather it should strive to suppress criminal behavior.

HEANEY, Senior Circuit Judge, dissenting.

Keith Jacobson's conviction should be set aside. Prior to instituting the sting, the Postal Service possessed no evidence giving rise to a reasonable suspicion that Jacobson, a 57–year old, law-abiding, Nebraska farmer with a 20–year record of honorable service in the armed services of the United States, had violated child obscenity laws in the past or was likely to do so in the future. The targeting of Jacobson violated federal law enforcement guidelines requiring an investigative agency to have a reasonable suspicion before investigating an individual that the prospective target is engaging, has engaged, or is likely to engage in illegal activities of a similar type.

Jacobson's conviction should also be set aside because the conduct of the Postal Service was outrageous, not only for the reason previously stated, but also because the Service made at least ten mailings to Jacobson over a period of 27 months, January 1985 to May 1987, before he succumbed to its solicitations to order an illegal magazine.

Had the Postal Service left Jacobson alone, he would have, on the basis of his past life, continued to be a law-abiding man, caring for his parents, farming his land, and minding his own business. Now he stands disgraced in his home and his community with no visible gain to the Postal Service in the important fight against the sexual exploitation of children.

The majority is concerned about unduly limiting the government's investigation of crime. I cannot accept this view, particularly because the government itself rejects the tactics used here as unacceptable.

An argument can, of course, be made that the administrative agency itself should enforce the policy against the targeting of individuals unless a reasonable suspicion exists for so doing, and well it should. The Postal Service should have done so here by vetoing the local decision to pursue Jacobson. But when an important constitutional right is involved, we should not shrink from requiring that a federal policy be followed. Of course, Jacobson has no right

to be free from investigation; all of us, judges included, have no such right. But here the government unlawfully undertook to induce him to violate the law with repeated solicitations to buy obscene materials. Before commencing the sting, the government had no evidence that Jacobson had ever purchased or possessed such materials or desired to do so.

Jacobson, a 57–year old resident of Newman Grove, Nebraska, currently lives on his family farm and supports his parents. He enlisted in the United States Navy in 1951. During his tour of duty, he served on a destroyer in the Korean theater. He was honorably discharged in 1955. He enlisted in the United States Army in 1958. He served in the Korean and European theaters and was decorated for his service. He retired from the Army in 1974.

On returning to Nebraska, Jacobson became a school bus driver and served in that capacity for ten years. Upon his retirement, he received a certificate of commendation from the Board of Education. There is not a hint in his 20–year service record of participation in illegal or improper sexual activities, and his record as a school bus driver is unblemished. He has no criminal history, with the exception of a conviction for driving while intoxicated in 1958.

On February 4, 1984, Jacobson ordered two magazines and a brochure from Dennis Odom, who did business as the Electric Moon in San Diego, California. On May 11, 1984, the government executed a search warrant on the Electric Moon business premises and seized the business's mailing list. Jacobson's name and address were on that mailing list.

The two magazines Jacobson ordered were "Bare Boys I" and "Bare Boys II." They were nudist magazines, the receipt of which did not violate any law. Receipts for his order were found in Blue Moon's files. The government had no information at the time it instituted the sting that Jacobson had purchased obscene materials through the mails or that he produced child pornography or that he was predisposed to do either.

Nevertheless, the government made Jacobson the target of five undercover sting operations involving at least twelve separate mail solicitations over a period of two and one-half years. Jacobson answered a survey sent to him during the first undercover operation. In his response, he indicated an interest in material about preteen sex. The government, in the guise of five separate, fictitious organizations and one fictitious individual, contacted Jacobson through the mail eleven more times before he finally ordered "Boys Who Love Boys," an admittedly obscene magazine. After sending him this publication, government agents arrested Jacobson and searched his home. No other illegal materials were found.

I adhere to the views I expressed in our panel opinion that Jacobson's Electric Moon purchase did not evidence a predisposition to purchase illegal child pornography and thus did not give rise to a reasonable suspicion that Jacobson had committed a crime in the past or was likely to commit one in the future. I continue to believe that the government must have such a reasonable suspicion before instituting an undercover sting directed at an individual, see United States v. Luttrell, 889 F.2d 806, 813 (9th Cir.1989), reh'g en banc granted, 906 F.2d 1384 (9th Cir.1990), and that because no such suspicion existed in this case, Jacobson's conviction must be set aside. Additionally, I believe that the Postal Service's repeated solicitation of Jacobson to purchase illegal pornography constituted conduct so outrageous and offensive that a conviction arising therefrom offends due process principles. See United States v. Russell, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973).

The requirement that law enforcement officials have a reasonable suspicion of actual or potential criminal behavior before targeting an individual for an undercover investigation is consistent with the investigative policies of the United States Attorney General, the FBI, and the United States Postal Service. The Attorney General's guidelines on FBI undercover operations provide that undercover operations

offering an inducement to illegal activities are not to be approved unless:

(a) there is a reasonable indication, based on information developed through informants or other means, that the subject is engaging, has engaged, or is likely to engage in illegal activity of a similar type; *or*

(b) The opportunity for illegal activity has been structured so that there is reason for believing that persons drawn to the opportunity, or brought to it, are predisposed to engage in the contemplated illegal activity.

Office of the Attorney General, Attorney General's Guidelines on FBI Undercover Operations 16 (Dec. 31, 1980), *reprinted in Law Enforcement Undercover Activities: Hearing before the Select Comm. to Study Law Enforcement Undercover Activities of Components of the Dep't of Justice,* U.S. Senate, 97th Cong., 2d Sess. 86, 101 (1982) [hereinafter *Senate Hearings* ]; *see also* Office of the Attorney General, Attorney General's Guidelines on Criminal Investigations of Individuals and Organizations 1 (Dec. 2, 1980), *reprinted in Senate Hearings, supra,* at 121 ("A key principle underlying these practices, and reflected in these Guidelines, is that individuals and organizations should be free from law enforcement scrutiny that is undertaken without a valid factual predicate and without a valid law enforcement purpose.").[1]

Additionally, Raymond J. Mack, an inspector with the United States Postal Inspection Service, testified at Jacobson's trial that the purpose of Postal Service testing programs was "to bring us into contact with individuals that have committed some type of criminal offense or [are] in the act of committing a criminal offense." Trial transcript at 92. To that end, according to Mack, Postal Inspection Service sting operations were to be directed only at those individuals whose names appeared independently on at least two lists acquired from the following sources: mailing lists seized by postal inspectors in separate child pornography investigations; incoming child pornography seized by the United States Customs Service; programs conducted by the FBI; investigations of mail order dealers of child pornography conducted by metropolitan police departments and state police agencies; or Postal Inspection Service regional testing programs. Trial transcript at 95, 97, 146–47. Calvin M. Comfort, a prohibited mailing specialist with the Postal Inspection Service, acknowledged at trial that the sole independent source on which Jacobson's name appeared was the Electric Moon mailing list. Trial transcript at 346.

The majority cites five cases from other circuits as holding that "the Constitution does not require reasonable suspicion of wrongdoing before the government can begin an undercover investigation" of a particular individual. One of these cases appears to be on point. *See United States v. Gamble,* 737 F.2d 853 (10th Cir.1984). In that case, the court allowed the defendant's conviction to stand despite its finding that government agents fabricated criminal schemes to enmesh a black doctor with no criminal record about whom the agents had "no apparent hint of a predisposition to criminal activity." *Id.* at 860.

In *United States v. Thoma,* 726 F.2d 1191 (7th Cir.), *cert. denied,* 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984), the court acknowledged that the government

---

1. William H. Webster, then director of the FBI, endorsed a reasonable suspicion standard for undercover investigations in his testimony during the Senate hearings on Justice Department undercover operations:

[O]ne of the basic standards for initiating an operation or for making a change in direction or a change in focus, which is one of the sore points we have observed in these various operations, currently appears in the Attorney General's Guidelines on Criminal Investigations, and that is that there must be facts or circumstances that reasonably indicate that a Federal criminal violation of the type to be investigated has occurred, is occurring, or is likely to occur. In other words, a reasonable cause provision.

*Senate Hearings, supra,* at 1041 (statement of Hon. William H. Webster); *see also id.* at 1055 ("We have come pretty close to it in the investigative guidelines that are already there, if we are talking about a reasonable suspicion basis. I have no problem with requiring an articulation of the reasons. I think we are doing that now, and we will certainly do it in the future.").

had a good faith basis for investigating the defendant. *Id.* at 1198. Its subsequent statement that such a basis is not a constitutional prerequisite to an undercover investigation is therefore dictum. *See id.* at 1198–99. In *United States v. Jannotti*, 673 F.2d 578 (3d Cir.) (en banc), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982), an attorney with a "proven ability to enlist corrupt politicians" provided the government with the defendants' names. *Id.* at 609. The Third Circuit concluded that this source "provided the government with a reasonable basis for the initiation of the bribe offers" it made to the defendants. *Id.* In an alternative holding, the court stated: "Where the conduct of the investigation itself does not offend due process, the mere fact that the investigation may have been commenced without *probable cause* does not bar the conviction of those who rise to its bait." *Id.* (emphasis added). The *Jannotti* court expressed no opinion as to whether an investigation commenced without a degree of suspicion less than that required for probable cause, or with no suspicion at all, would offend due process.

In *United States v. Jenrette*, 744 F.2d 817 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1099, 105 S.Ct. 2321, 85 L.Ed.2d 840 (1985), the District of Columbia Circuit rejected the contention of a former United States congressman that the FBI's targeting of him in the ABSCAM sting without a reasonable suspicion of criminal behavior violated due process. The court relied on *United States v. Kelly*, 707 F.2d 1460 (D.C. Cir.), *cert. denied*, 464 U.S. 908, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983), an earlier appeal in another ABSCAM prosecution. The *Kelly* court stated:

> [B]ecause *dishonest public officials*, responsive more to money than to their obligations to the nation, may cause grave harm to our society, we recognize the need for law enforcement efforts to detect *official corruption.* Furthermore, such corruption is "that type of elusive, difficult to detect, covert crime which may justify Government infiltration and undercover activities."

*Id.* at 1473–74 (emphasis added) (citation omitted). The court considered the "genuine need to detect corrupt public officials as well as the difficulties inherent in doing so" to conclude that the FBI's targeting of Congressman Kelly did not constitute intolerable government conduct. *Id.* at 1474. The *Jenrette* court recognized that *Kelly's* holding was premised on law enforcement needs in detecting official corruption, observing that "other courts of appeal have considered and rejected the contention that the government must have a reasonable suspicion of wrongdoing before offering a bribe to a *public official.*" 744 F.2d at 824 n. 13 (emphasis added) (citations omitted).

Similarly, in *United States v. Myers*, 635 F.2d 932 (2d Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980), the Second Circuit rejected the argument that the Constitution requires "The Executive Branch [to] demonstrate some basis of suspicion (short of probable cause) before deciding to make any *Member of Congress* the target of a sting." *Id.* at 941 (emphasis added). The court based its rejection of such a requirement, in part, on the limitations the Speech or Debate Clause places on the conduct of a congressman that may be made the basis of a prosecution and the evidence that may be used against him. *Id.*

Two factors motivating the holdings in *Jenrette* and *Myers*, the need to detect official corruption and the constitutional safeguards available to congressmen-targets of the ABSCAM sting, are absent from the government's targeting and prosecution of Jacobson. Thus, we need not decide in this case whether we should follow them.

Additionally, I believe the conduct of the Postal Service's sting operations involving Jacobson was so outrageous that the prosecution arising therefrom violates Jacobson's due process rights. Once the Postal Service obtained Jacobson's name from the Electric Moon mailing list, its operatives commenced a two and one-half year campaign of deceptive mail solicitations whose sole object was to induce Jacobson to commit a crime "merely for the sake of press-

ing criminal charges against him when, as far as the record reveals, he was lawfully and peacefully minding his own affairs." *United States v. Twigg,* 588 F.2d 373, 381 (3d Cir.1978).

The Postal Service first contacted Jacobson through a sting operation called "The American Hedonist Society," "a private, members only society for those who adhere to the doctrine that pleasure and happiness is the sole good in life." Government Exhibit 7. Jacobson completed the purportedly confidential questionnaire, indicating an interest in preteen sexual material. The Postal Service then "enrolled" Jacobson in the American Hedonist Society and began sending him the Society's newsletters, which advertised sexually explicit materials for sale. Jacobson never ordered any of the advertised materials.

The Postal Service then approached Jacobson through "Midlands Data Research," "a small, old established firm in Lincoln, Nebraska" which purported to conduct "consumer surveys on a variety of subjects." Government Exhibit 8. The mailing included a questionnaire and a letter which stated: "If you believe in the joys of sex and the complete awareness of those lusty and youthful lads and lasses of the neophite [sic] age, we would like to hear from you." *Id.* Jacobson responded that Midlands Data Research should feel free to send him further information, but did not answer the questionnaire.

Jacobson's failure to complete the questionnaire prompted the Postal Service to send another letter and questionnaire from the "Heartland Institute for a New Tomorrow" (HINT). HINT described itself as a lobbying organization "founded to protect and promote sexual freedom and freedom of choice" by urging the repeal of "arbitrarily imposed legislative sanctions restricting *your* sexual freedom." Exhibit 102. The HINT letter asked Jacobson to reconsider his refusal to participate in the Midlands Data Research survey. Jacobson responded by completing the HINT questionnaire.

The Postal Service next sent Jacobson a letter from the director of HINT, which stated:

We at HINT have computer matched your response with the responses of others who have similarly completed our survey questionnaire. Enclosed with this correspondence you will find a list of persons with backgrounds and interests similar to yours. Won't you take a little time in the interest of sexual freedom and write to one of the persons on the list? It's the only way to overcome the pressures of society which come to bear on each of us.

We welcome any comments or suggestions you might have concerning HINT or its programs.

Defendant's Exhibit 113. Jacobson neither responded to this letter nor wrote to any of the individuals on the accompanying list.

The Postal Service next used a technique known as "mirroring" to acquire further information from Jacobson. A postal inspector posing as "Carl Long," a supporter of HINT with interests similar to Jacobson's, wrote to Jacobson stating that he collected erotic literature and wished to correspond with him. Government Exhibit 11; trial transcript at 342. Jacobson replied that he too collected erotica and would be willing to correspond. Government Exhibit 12. Long responded, inquiring about Jacobson's interest in amateur sex videos. Government Exhibit 13. Jacobson again wrote to Long, noting that amateur videotapes were difficult to acquire, naming several film sources, and stating that he preferred "good looking young guys (in their late teens and early 20's)." Government Exhibit 14. Jacobson failed to answer a third letter from Long.

After Jacobson ceased writing to Long, the Postal Service again contacted Jacobson, posing as the "Far Eastern Trading Company Ltd." of Hong Kong and "Produit Outaouais" of Quebec, two mail-order retailers of erotica. After receiving a second mail solicitation, Jacobson ordered "Boys Who Love Boys" from the Far Eastern Trading Company. When the Postal Service delivered the magazine to Jacob-

son, he was arrested, charged with, and convicted of knowingly receiving through the mails sexually explicit material depicting a minor.

Jacobson's conviction thus was the culmination of the Postal Service's two and one-half year campaign to induce this heretofore law-abiding farmer to violate the obscenity laws. Posing as an imaginative variety of spurious organizations and individuals, all apparently legitimate, the Postal Service first engaged Jacobson in a dialogue about erotica, then presented him with a series of opportunities to purchase government-compiled pornography through the mails. When Jacobson failed to complete a Postal Service questionnaire, the Postal Service sent him another and urged him to reconsider responding. When Jacobson ceased corresponding with a Postal Service "pen pal," the Postal Service renewed its approach under the guise of two fictitious purveyors of erotica who assured Jacobson that their mailings would not run afoul of United States Customs.

In its pursuit of Jacobson, I believe the Postal Service's direct and continuous involvement in the creation and maintenance of opportunities for criminal activity rises to that demonstrable level of outrageousness which violates due process. *See Hampton v. United States*, 425 U.S. 484, 495 n. 7, 96 S.Ct. 1646, 1653 n. 7, 48 L.Ed.2d 113 (1976) (Powell, J., concurring); *see also Greene v. United States*, 454 F.2d 783, 787 (9th Cir.1971) ("When the Government permits itself to become enmeshed in criminal activity, from beginning to end, to the extent which appears here, the same underlying objections which render entrapment repugnant to American criminal justice are operative.").

Moreover, all the time, effort, expense, and ingenuity invested in apprehending Jacobson yielded only a single conviction of a single individual for the receipt of a single obscene magazine that would never have entered the United States mails had the Postal Service not deposited it there in the first place. The investigation of Jacobson produced no new evidence against existing pornography producers or purchasers and did nothing to further the goal of preventing the sexual exploitation of minors. As the Seventh Circuit has observed:

> If the police entice someone to commit a crime who would not have done so without their blandishments, and then arrest him and he is prosecuted, convicted, and punished, law enforcement resources are squandered in the following sense: resources that could and should have been used in an effort to reduce the nation's unacceptably high crime rate are used instead in the entirely sterile activity of first inciting and then punishing a crime.

*United States v. Kaminski*, 703 F.2d 1004, 1010 (7th Cir.1983) (Posner, J., concurring).

In my view, the government's investigation and prosecution of Jacobson amount to the deliberate manufacture of a crime that would never have occurred but for the Postal Service's overzealous efforts to create it. Jacobson's conviction should be reversed. Accordingly, I dissent.